36408. JACKSON *v.* SMITH.

698

*Robert W. Spears, Wm. G. Grant,* for plaintiff in error.
*Calhoun & Calhoun, Clarence H. Calhoun, Jr.,* contra.

Felton, C. J. This case was first before this court in *Jackson* v. *Smith,* 92 *Ga. App.* 677, 679 (89 S. E. 2d 526), on the question of whether the petition stated a cause of action as against a general demurrer. In holding that it did, the court said, "It is alleged that the plaintiff was at all times mentioned a duly licensed real-estate broker of this State; that the defendant, knowing at the time that he did not own a certain piece of real property in the City of Atlanta, requested the plaintiff to find a purchaser therefor; that his representation of ownership was made with the knowledge that the plaintiff would act upon the request to find a purchaser, and for the purpose of deceiving the plaintiff and defrauding her of a commission which she would have earned from a prospective purchaser had the defendant's representation of ownership been true; and that by reason of the defendant's fraudulent and deceitful acts the plaintiff was deprived and defrauded of a commission of $500."

On the trial of the case, the court sitting without a jury found for the plaintiff. The defendant's motion for new trial was denied and he excepts.

Mrs. Sylvia Weissman testified on behalf of the plaintiff in part as follows: "In September and October of 1954 I was an agent for Dora Smith Realty Company. During September and October of 1954 I was employed by the plaintiff in this case.

"Yes, I know Mr. W. B. Jackson, defendant in this case. I had some dealings with Mr. Jackson in September or October of 1954. I was an agent employed by Mrs. Smith and as such, authorized to act for her. As to what dealings I had with Mr. Jackson, defendant in this case; in September and October of 1954 through a mutual friend and associate—business associate told me about a piece of property for sale—Mr. William T. Boyd —and it was in his office at Colonial Investment in the Volunteer Building that I first heard about the piece of property in ques-

tion. He asked me if I had any clients to buy a piece of colored property. I said, 'Yes, sir.' I did quite a bit of selling; I had quite a few clients I was looking for property for. He said, 'I know the piece of property, and I have a plat of it here,' and he would call the owner in question. He called Mr. Jackson. That first telephone conversation, I didn't speak to Mr. Jackson. I started showing the property. I showed it to several people, and then went back to Mr. Boyd's office. At that time, when he called Mr. Jackson, I spoke to him and told him I had the party in question that was interested in the property, and at that time, I had contacted Mr. Harper and I showed him the property several times—once alone and once with an architect, and he decided he was very much interested in the property, and that he would like to try and purchase the property. I then contacted Mr. Jackson. I said I talked to Mr. Jackson, the defendant in this case. I was in Mr. Boyd's office the first time. The second time, I called him. As to what conversations took place between me and Mr. Jackson on that date; been so long— I'll try to remember it word for word. Two years is a long time. I just told him that I had someone that was interested in the property, and I think it was reaffirmed—the price—at the time, but the exact wording, I can't repeat—in that length of time. He made no objection to me showing the property, and there was no knowledge that he didn't want me to show the property. Everything was in the affirmative as far as the conversation was concerned. The second conversation was from my home when I called to make an appointment to bring Mr. Harper out with me to negotiate an option. As to when that conversation took place— that is, the second one; oh, approximately September 19th. I talked to Mr. Jackson; I'd never met him personally. As to what he told me at the time of this conversation; we made an appointment to meet on the 22nd at his office with Mr. Harper. Yes, I did subsequently meet with Mr. Jackson on September 22, 1954, and Mr. Harper. . . As to whether after the date this option was signed, I had any contact or any dealings with Mr. Jackson about the sale of this property; yes, sir. About—I don't know whether it was ten days or two weeks afterwards, I got a call at home, and I can almost repeat this conversation word for word. I did recognize Mr. Jackson's voice.

He's got a very fine voice—easily recognizable. He said, 'Mrs. Weissman, I'm in a little difficulty.' I said, 'Yes, sir, Mr. Jackson, what can I do for you?' He said, 'You know the piece of property I've given an option on. Well, I had an option on it, and the option wasn't any good.' He said, 'Now, I wonder if you can help me with it?' I said, 'Yes, sir, I'll be glad to,' and that's the first instance that I knew Mr. Jackson didn't have title to the property, and I was quite a bit taken back, and he told me the property was not entitled but held through the family of the Camp's on Briarcliff Road, and would I go out with him. It so happened—it turned out, I went to the Camp's alone to help him gain possesion of the property quick enough so when the option was exercised he would have title to the property, but when I went out there, the Camp's explained to me it was in trust for a minor child, and it was, I guess, to go through probate court. They had never given an option on the piece of property. Yes, I said that was ten days or two weeks after the date Mr. Jackson signed plaintiff's exhibit 1. That is the first time that Mr. Jackson told me that he didn't own the property. . . As to what, if anything, was said by Mr. Jackson in our several conversations with him prior to September 22nd about me selling this property, and on September 22nd as to the ownership of it; well, he didn't say that he didn't own it. He told me—gave me permission to bring him an option and appointment. I had no idea he didn't have title to the property. As to whether he said anything about an option from someone else; no, sir, I never heard of it. No sir, he did not mention the Camp's; the first time I heard the Camp's name is when he called me and asked me if I would help him. As to whether he told me I was going to try to sell this property for him; yes, sir, that was understood. He didn't tell me not to sell it. . ."

The witness further testified that on September 22, 1954, she, the defendant, and Mr. Harper had a meeting at which time the defendant executed to Mr. Harper an option to sell the property.

Nowhere in the evidence is it shown that the defendant ever represented to Mrs. Weissman that he owned the property in question, nor is there any evidence of any contract of employment whereby the defendant engaged Mrs. Weissman to sell the property. All that was shown by the evidence was that the de-

fendant never told Mrs. Weissman that he did not own the property. Clearly the evidence fails to show that the defendant ever made a wilful misrepresentation to Mrs. Weissman concerning his ownership of the property, and nowhere does the evidence show that Mrs. Weissman ever relied upon any representation made by the defendant. The plaintiff also failed to show deceit under the theory of failure to disclose a material fact. To support an action of deceit on the grounds of failure to disclose a material fact, the evidence must show that there was a concealment of a material fact, that such concealment was done to induce another to act and that it was done in such a manner as to deceive and mislead. The evidence failed to show that the defendant wilfully concealed his lack of ownership of the property, to deceive and mislead Mrs. Weissman and to induce her to act. Nor does the evidence show that Mrs. Weissman relied on any such concealment.

Since the evidence failed to show a wilful misrepresentation as alleged and since such evidence unobjected to fails to show deceit on the theory of failure to disclose and concealment, the verdict in favor of the plaintiff was not authorized.

The court erred in denying the motion for new trial.

*Judgment reversed. Quillian and Nichols, JJ., concur.*