The HAMILTON BANK AND TRUST COMPANY, Plaintiff,

v.

T. Wendell HOLLIDAY, N. Rountree Youmans, Thomas F. Mahone, John G. Brennan, Richard A. Chepul, John Vorder Bruegge, James D. Garner, Gary D. Sweetin, Devereux Chamberlain, Donald Jones, William Puckett, Richard L. Heffner, Paul R. Cobble, James T. Vann, B. Lamar Rankin, Phillip S. Barrett, W. Max Finley, John L. Hutcheson, Jr., H. Clay E. Johnson, W. Hanes Lancaster, Jr., William Deaderick Moon, Jr., Z. Cartter Patten, J. Polk Smartt, Blackwell Smith, Jr., Richard C. Thatcher, Jr., David D. Hamilton, and the First American National Bank of Nashville, Executor of the Estate of E. Carmack Cochran, Defendants.

Civ. A. No. C76–1558A.

United States District Court,
N. D. Georgia,
Atlanta Division.

May 4, 1979.

Thomas Richey and Robert W. Patrick, Powell, Goldstein, Frazer & Murphy, Atlanta, Ga., for plaintiff.

John C. Stophel and John R. Seymour, Stophel, Caldwell & Heggie, Chattanooga, Tenn., for defendant Heffner.

Edgar H. Sims, Jr., Kutak, Rock & Huie, Atlanta, Ga., for defendants Youmans, Mahone and Barrett.

Terry L. Miller and Warren N. Coppedge, Jr., Mitchell, Mitchell, Coppedge, Boyett & Wester, Dalton, Ga., for defendants Brennan, Sweetin and Garner.

James W. Gentry, Jr., Gentry & Boehm, Chattanooga, Tenn., for defendants Cobble, Rankin and Vann.

A. Stephens Clay, Thomas C. Harney and Jerre B. Swann, Kilpatrick, Cody, Rogers, McClatchey & Regenstein, Atlanta, Ga., for Finley, Hutcheson, Johnson, Lancaster, Patten, Smartt, Smith and Thatcher, Hamilton and The First American National Bank of Nashville, Executor of the Estate of E. Carmack Cochran.

Michael T. Turner, McClain, Mellen, Bowling & Hickman, Atlanta, Ga., for Devereux Chamberlain.

John Vorder Bruegge, William Deaderick Moon, Richard A. Chepul, T. Wendell Holliday, Don L. Jones, and William Puckett, pro se.

### ORDER

MOYE, District Judge.

This is an action for rescission and damages brought by the Hamilton Bank and Trust Company ("HB&T") under the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77a *et seq.*; the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78a *et seq.*; the Georgia Securities Act of 1973, Ga.Code Ann. § 97–101 *et seq.*; and the common law of fraud. Plaintiff HB&T claims that the defendants, who are former officers and directors of Hamilton Bancshares, Inc. ("HBI") and Hamilton Factors, Inc. ("HFI"), violated certain provisions of the federal and state securities laws and committed common law fraud in connection with the sale to HB&T by HFI of a participating interest in a pool of loans extended by HFI to various borrowers.

Presently pending before the Court are the motions for summary judgment filed by defendants W. Max Finley; John L. Hutcheson, Jr.; H. Clay E. Johnson; Richard C. Thatcher, Jr.; Z. Cartter Patten; J. Polk Smartt; W. Hanes Lancaster, Jr.; Blackwell Smith, Jr.; David D. Hamilton; The First American National Bank as Administrator c. t. a. of the Estate of E. Carmack Cochran, Deceased; W. D. Moon, Jr.; John Vorder Bruegge; Richard L. Heffner; N. Rountree Youmans; Phillip S. Barrett; Thomas F. Mahone; James D. Garner; Gary D. Sweetin; and John G. Brennan.

## I. *Factual and Procedural Background*

HBI was a bank holding company based in Chattanooga, Tennessee, and its lead bank was the Hamilton National Bank of Chattanooga ("HNB"). Both HBI and HNB are now in bankruptcy and are not defendants in this action. Defendant N. Rountree Youmans served as president and chairman of the board of directors of HBI from January 1973 until April 1975. Other HBI officers included defendant Thomas F. Mahone, who was the executive vice-president in charge of coordinating credit policies for HBI and its bank subsidiaries from July 1973 until April 1975, and defendant T. Wendell Holliday, who served as first executive vice-president in charge of operations for HBI from 1973 until April 1975, and president of HBI from April 1975 until February 1976.

HFI, one of HBI's wholly-owned non-banking subsidiaries, was a factoring and commercial finance company which was organized in early 1974 and located in Atlanta, Georgia. HFI is now bankrupt and is not a defendant in this action. Factoring refers to the purchase of a client's customer invoices, while commercial finance involves lending money to a client with the client's customer invoices serving as security for the loan.[1] Defendant John G. Brennan was president of HFI during 1974, and his duties involved the solicitation of factoring customers and administrative work related to the supervision of accounts with factoring customers. Defendant James D. Garner served as vice-president in charge of HFI's commercial finance department during 1974 and 1975. Garner's duties included establishing HFI's commercial finance operation, hiring staff, soliciting clients, and policing the credit made available to HFI's existing clients. Defendant Gary D. Sweetin was the comptroller of HFI from March 1974 until August 1975, and his duties involved internal auditing and bookkeeping. He also acted as Secretary of HFI on various occasions.

HFI's board of directors consisted of defendants Youmans, Mahone, Holliday, Brennan, and Richard A. Chepul, the chief financial officer of HBI. Although HFI's board of directors met periodically to elect officers and designate depositories, it made only one or two decisions concerning the financing operations and policies of the company. All major corporate decisions involving HFI appear to have been made by HBI's management. Defendant Mahone was responsible for supervising HFI, and defendant Brennan reported directly to him. In addition, HFI was completely dependent upon the proceeds of HBI's sale of commercial paper for its working capital.

During the period of time that defendant Youmans served as president and chairman of the board of directors of HBI, the bank holding company acquired a number of Tennessee Banks. HBI also held interests in several Georgia banks and wanted to expand its banking activities in Georgia if certain bank holding company legislation was enacted. In early 1974, defendant Youmans became aware that the Georgia Savings Bank and Trust Company was for sale. Youmans wanted HBI to acquire this Georgia bank, but he was advised that HBI should not directly involve itself in the purchase of the Georgia bank's stock. Youmans thus arranged for Theodore M.

---

1. Clients are the entities to whom HFI advanced funds, and customers are the entities invoiced by HFI's clients.

Hutcheson,[2] a friend to whom Youmans had given investment advice on past occasions, to acquire the stock of the Georgia Savings Bank and Trust Company. It was apparently Youmans' intention that HBI might eventually acquire the Georgia bank from Hutcheson if favorable bank holding company legislation was enacted in Georgia.

In order to finance the purchase of the Georgia bank by Theodore Hutcheson, defendant Youmans arranged for HNB to loan Hutcheson $5,000,000, a sum representing almost 100 percent of the purchase price of the Georgia bank's stock. Defendant Youmans promised Hutcheson, who was not a banker, that the latter would be able to earn a profit of $3,000,000 on the sale of his stock within a single year. Youmans also arranged for HBI to serve as an advisor to Theodore Hutcheson and the Georgia bank to insure that the bank was properly managed. In addition, the bank was converted from a savings institution to a commercial bank with the assistance of HNB's employees and resources.

The Georgia Savings Bank and Trust Company did not actually become a subsidiary of HBI, but it did appear to have a relatively close relationship with the HBI system. The Georgia bank was renamed "The Hamilton Bank and Trust Company ("HB&T") over the protest of HBI's attorney, defendant W. D. Moon, Jr.,[3] and the bank was allowed to use the "HB" logo used by HBI and its subsidiaries. HB&T contracted with HBI or its divisions for data processing and management services, and HB&T's newly hired president, Homer W. Whitman, Jr. (recommended by Youmans) reported regularly to Youmans for the purpose of seeking his approval and advice on such matters as the election of new directors, the hiring of executive officers, the declaration of dividends, and the location of branch sites. In addition, banking subsidiaries of HBI advanced funds to individuals to finance the purchase of stock in HB&T. Furthermore, HNB and HB&T had a correspondent banking relationship and HFI of Atlanta, Georgia, kept payroll and concentration accounts with HB&T.

HB&T's relationship with the HBI system appeared to become even stronger following HBI's decision to institute a loan reduction program throughout its system in the summer of 1974. HBI had a consolidated loan-to-deposit ratio of over 90 percent, and the bank holding company ordered its subsidiary banks to reduce their loans by 12 percent and prohibited its nonbanking subsidiaries, including HFI and the Hamilton Mortgage Company ("HMC"), from making new loans. HMC had been in the business of originating loans and selling participations in the loans to other subsidiaries in the HBI system.[4] HNB, in particular, had participated heavily in mortgage loans with HMC, and HNB had been cautioned by the Federal Reserve Board that loan participations would be considered as loans for the purpose of determining whether section 24(c) of the Federal Reserve Act, 12 U.S.C. § 371(c), had been violated. As part of the loan reduction program, defendant Mahone, the HBI executive vice-president in charge of coordinating the allocation of loan participations within the HBI system, personally made efforts to sell HMC mortgage loan participations to outside financial institutions, including HB&T.

---

**2.** Theodore Hutcheson is the son of defendant John L. Hutcheson, Jr., who was a director of HBI, but not an officer or employee of the bank holding company. Defendant Hutcheson was not an officer, director, or employee of any of HBI's subsidiaries.

**3.** Defendant W. D. Moon, Jr., was a director of HBI, but was not an officer or employee of the bank holding company. He was not an officer, director, or employee of any of HBI's subsidiaries.

**4.** "Selling a participation" in loans involves the following: Loans are made to borrowers by a lender. The "purchaser" of the participation pays the lender (the "seller") a percentage of the amount of participated loans. The "purchaser" receives in exchange for his payment a commensurate percentage interest in the purchased loans and in the security for them. The form, method, and effect of this transfer of interest appears to vary, depending upon the individual facts and circumstances of each transfer.

In late August or early September 1974, a meeting was held by officers of HBI, HMC, and HB&T. The purpose of the meeting was to give HB&T representatives an opportunity to review certain mortgage loan files of HMC. Defendants Youmans, Holliday, and Mahone represented HBI; defendant Phillip S. Barrett, president of HMC, and two of his subordinates represented HMC; and Mr. Whitman and two vice-presidents, Patrick Hickey and Clifford Hornsby, represented HB&T at the meeting. Defendant Youmans allegedly told the HB&T officers that HB&T could select the loans in which it wished to participate and that any loan participations would be repurchased on demand. He also supposedly offered to arrange for HBI subsidiary banks to purchase C.D.s from HB&T in order to provide the latter bank with funds for the purchase of loan participations. The C.D.s were to remain at HB&T during the life of the participations.

During the course of the meeting, defendant Mahone had suggested that HB&T also consider participating in loans made by HFI. Arrangements were made for Mr. Hickey to review HFI's loan files, and shortly thereafter, Hickey went to HFI's office in Atlanta, Georgia, to review a number of loan portfolios. Meanwhile, on August 13, 1974, HNB made an $8.3 million deposit at HB&T from which C.D.s were issued to various HBI subsidiary banks. On August 14, 1974, HB&T's loan committee met and approved the purchase of loan participations from HFI, HMC, and HNB for more than $4,000,000.

On September 20, 1974, HB&T and HFI entered into a loan participation agreement whereby HB&T agreed to purchase and HFI agreed to sell certain participations in a pool of loans on a 30-day basis in an unstated amount, up to 90 percent of each note. The loans in which HB&T agreed to participate had been extended by HFI to the following Georgia companies: New Georgia Industries, Inc., New Georgia Plumbing, Inc., North Georgia Supply & Appliance Co., Scogin & Miller Realty Co., Miller Sysong, Inc., and Stasco Plumbing, Inc. (collectively referred to as New Georgia).

On September 23, 1974, HFI issued a participation certificate to HB&T showing the purchase of a 57 percent interest in the pool of loans, and at the same time HB&T transferred $1.8 million to HNB. In purchasing participations in the loan pool, HB&T acquired a portion of HNB's interest in the pool. On October 1, 1974, HFI issued a second participation certificate to HB&T pursuant to the September 20, 1974 agreement. This issuance represented in part the reissuance of the first loan participation and resulted in a total transfer to HB&T of a 90 percent interest in the $2 million New Georgia loan pool.

The loans in the pool consisted primarily of revolving lines of credit, evidenced by financing agreements with automatically renewable one-year terms. The loans were managed by HFI and were secured by assignments of accounts receivable, inventory and, in some instances, work in progress. Advances, collections, receipts of collateral and verifications of receivables by HFI took place on a continuous basis, with procedures calling for periodic audits as well. HFI made its decisions to advance funds based on evaluations of the current collateral, and the outstanding balances on the lines of credit fluctuated daily. HFI remitted interest to HB&T according to a formula which was not based on HFI's actual receipt of interest. This method of payment was contrary to that contemplated by Mr. Whitman, who executed the loan participation agreement on behalf of HB&T and who believed that HB&T's share of interest would be paid only out of money actually received by HFI.

Between October 1, 1974, and the issuance of the third and final loan participation certificate to HB&T on May 1, 1975, both HFI and HBI experienced serious problems. HFI had earlier suffered a large loss in one of its factoring accounts, and a decision was made in the late fall of 1974 to liquidate the factoring division of the company. In April 1975, representatives of Manufacturers Hanover Trust Company's

factoring subsidiary reviewed HFI's operations and found that the internal controls, collection efforts, and credit decisions were poor. In fact, the subsidiaries of New Georgia Industries, Inc., were collecting on assigned receivables without remitting payments to HFI. There were also high levels of delinquencies among the accounts receivable assigned by New Georgia to HFI, and HFI's management discovered that the value of the property securing the loan to Scogin & Miller Realty Company, New Georgia Industries' real estate subsidiary, had been inflated.

Meanwhile, HBI had been the subject of a highly critical examination by the Office of the Comptroller of the Currency which found that the HBI system was heavily involved in HMC's real estate participations. In addition, certain directors of HBI were becoming increasingly concerned with defendant Youmans' management of the company, and some directors believed that Youmans should be replaced. On February 5, 1975, at a tape-recorded HBI board meeting, defendant Youmans, Holliday, and Chepul informed the other directors of the financial condition of HFI and HMC and explained how the HBI management was attempting to deal with the problems of these subsidiaries. It was at this meeting and at the subsequent HBI board meeting on March 12, 1975, that certain directors allegedly first learned that HFI had sold loan participations to HB&T and HNB.[5]

In March 1975, HBI entered into a revolving credit agreement with certain banks which imposed significant restrictions on HBI's ability to meet commitments to borrowers. In April 1975, defendant Youmans was replaced as the president and chairman of the board of directors of HBI. On May 1, 1975, HFI issued a third and final loan participation certificate to HB&T, effecting a transfer to HB&T of a 67 percent interest in the New Georgia loan pool of $2,700,000. HB&T did not actually pay any new funds for the final loan participation certificate, so the total amount that the bank paid for its participation in the pool of loans remained at $1,800,000.

In November or December 1975, HBI and HFI refused to repurchase HB&T's participation in the New Georgia loan pool on demand. HB&T then attempted to salvage its interest in the loan pool by trying to arrange for a reworking of the loans with the New Georgia companies and by making at least one direct unsecured loan to the companies. HB&T was eventually repaid $1,195,000 of its $1.8 million loan participation. As to the remaining $605,000 plus interest thereon, the bank waited for the bankruptcy trustee to collect what he could on the loans and turn over to the bank its claimed share. When the trustee failed to do so and challenged the bank's interest in the loans, HB&T brought this suit on September 20, 1976.

In its complaint, plaintiff HB&T has invoked the Court's jurisdiction under section 22(a) of the Securities Act, 15 U.S.C. § 77v(a); under section 27 of the Exchange Act, 15 U.S.C. § 78aa; and under the doctrine of pendent jurisdiction. The plaintiff contends that the loan participation or participations[6] at issue in this suit are securities within the meaning of section 2(1) of the Securities Act, 15 U.S.C. § 77b(1); section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10); and Ga.Code Ann. § 97–102(a)(16). Plaintiff HB&T alleges that the defendants are liable under: (1) section 12(1) of the Securities Act, 15 U.S.C. § 77*l*(1), because of the failure to register HFI's alleged securities with the Securities and Exchange Commission, as required by section 5 of the Securities Act, 15 U.S.C. § 77e; (2) section 12(2) of the Securities Act, 15 U.S.C. § 77*l*(2), because of alleged material

5. The pertinent portions of the transcripts of the February 5, 1975, and March 12, 1975 meetings are attached to this order as Appendices A and B, respectively.

6. The plaintiff asserts in the complaint that there were substantial changes in the New Georgia loan pool from time to time and that, in effect, the plaintiff purchased a new interest or participation in the pool each time such changes occurred. Accordingly, the plaintiff appears to be arguing that this case involves a number of loan participations purchased by HB&T rather than a single loan participation.

misrepresentations and omissions in prospectuses and oral communications by the defendants relating to the offer and sale of loan participations by HFI; (3) section 15 of the Securities Act, 15 U.S.C. § 77o, as controlling persons of HFI and other sellers of the loan participations; (4) section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and rule 10b–5 promulgated thereunder, because HFI, HBI, and the defendants allegedly falsely, fraudulently, and recklessly induced the plaintiff to purchase the loan participations, made material misrepresentations and omissions in connection with the sale of the participations, and engaged in actions, practices, and a course of business which operated as a fraud and deceit in connection with the plaintiff's purchase of the alleged securities; (5) section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), as controlling persons of HFI and HFI's officers and directors; (6) sections 15 and 29(b) of the Exchange Act, 15 U.S.C. §§ 78o and 78cc(b), because the loan participation agreement entered into by plaintiff HB&T was allegedly void under these sections of the Act, and the defendants allegedly aided, assisted, and participated in these violations; and (7) Ga.Code Ann. §§ 97‑112(a)(2), 97–112(a)(4), and 97 114 and Georgia common law because of the defendants' alleged acts, misrepresentations, and omissions noted above. Plaintiff HB&T asserts that it is entitled to rescission of the September 20, 1974 loan participation agreement and restitution from the defendants in the amount of $605,000 plus interest thereon and attorneys' fees or, in the alternative, actual damages in the amount of $711,764.70 plus interest thereon. The plaintiff also claims that it is entitled to punitive damages in the amount of $5 million as well as other relief that the Court deems appropriate.

Shortly after the filing of the complaint, defendants Youmans, Barrett, and Mahone filed a motion to dismiss this suit on the ground that the loan participation between HB&T and HFI was not a security and that the Court therefore lacked jurisdiction over the subject matter of this action. Several other defendants filed motions for summary judgment based on the same record. The Court denied these motions on March 22, 1977, concluding that there were material issues of disputed fact and that the jurisdictional question could not be decided independently of a consideration of the merits of the case. The Court further concluded that its consideration of the merits would not be appropriate until the facts had been better developed in this case.

Considerable discovery has been conducted in this action since the Court's ruling on March 22, 1977. After numerous extensions of the period for discovery, the Court entered an order on September 21, 1978, setting forth a procedure for completing discovery and filing motions for summary judgment. The parties were directed to complete their discovery pertaining to the issues of whether, assuming that all of the allegations of the complaint relating to fraud and violations of the securities laws and to the plaintiff's entitlement to recover therefor could be proven, each defendant is liable for such fraud and violations of the securities laws. The Court provided that within thirty days following the completion of this discovery, each defendant could file a motion for summary judgment based on the issues of involvement and participation in the alleged fraud and violations of the securities laws. In its order, the Court reserved the issues relating to the alleged fraud and securities laws violations and to the recovery for such violations for additional discovery and later determination. Thus, the Court will presently rule on the pending motions for summary judgment as to the issues of involvement, participation, and control.[7]

II.  *Motions for Summary Judgment of Defendants Finley, Hutcheson, Johnson, Thatcher, Patten, Smartt, Lancaster, Smith, Hamilton, and The First American National Bank as Administrator c.t.a. of the Estate of E. Carmack Cochran, Deceased*

These defendants (hereinafter collectively referred to as the "Outside Directors") were

---

**7.** The Court will also consider the defendants' contention that the plaintiff's security registra-

tion claim is barred by the applicable statute of limitations.

directors of HBI, but were not officers or employees of HBI and were not officers, directors or employees of either HFI or HMC. In support of their motions for summary judgment, the Outside Directors contend that there is no genuine issue as to any material fact relating to the allegations that they: (1) participated in the alleged sale of securities or the alleged fraud or violations; (2) aided, abetted or assisted in that sale or the alleged fraud or violations; or (3) are liable because they controlled the alleged seller or anyone who allegedly did participate, aid, abet or assist in the alleged sale or the alleged fraud or violations. The Outside Directors assert that they did not participate, aid, abet or assist in the alleged sale or the alleged fraud or violations, that they did not have the knowledge, bad faith or involvement requisite to holding them liable for "control," and that they are therefore as a matter of law entitled to judgment. The Outside Directors also contend that the plaintiff's security registration claim is barred by the statute of limitations.

The Court will first address the issue of whether plaintiff HB&T's security registration claim in Count One of the complaint is time-barred. Section 13 of the Securities Act, 15 U.S.C. § 77m, provides in pertinent part:

No action shall be maintained to enforce any liability . . ., if the action is to enforce a liability created under section 77*l*(1) of this title, unless brought within one year after the violation upon which it is based.

The alleged violation of section 5 of the Securities Act, 15 U.S.C. § 77e, upon which the alleged liability under section 12(1) of the Act, 15 U.S.C. § 77*l*(1), is asserted was a failure to register alleged securities allegedly manifested by the loan participation agreement executed on September 20, 1974, and the certificates issued pursuant to that agreement successively on September 23, 1974, October 1, 1974, and May 1, 1975. The plaintiff also claims that each change in the New Georgia loan pool resulted in the sale of a security and that such a change occurred as late as the summer of 1975. This action was not filed, however, until September 20, 1976.

■ The relevant inquiry regarding the running of the statute of limitations provided in section 13 of the Securities Act is "which of the defendant's activities—offer, sale or delivery—occurred last" because this last event is the time from which to measure the limitation period. *Doran v. Petroleum Management Corp.*, 576 F.2d 91, 93 (5th Cir. 1978). In the instant case, there was no alleged activity involving the New Georgia loan pool after the summer of 1975.

■ The plaintiff's assertion that the sale of the alleged securities has never been formally completed because there has been no delivery of a certificate representing HB&T's final interest in the loan pool is irrelevant. The limitation period in section 13 of the Securities Act runs from the time of the last alleged *violation* or pertinent *activity*. 576 F.2d at 93. Since this action was filed more than one year after the alleged violation upon which it is based, plaintiff HB&T's registration claim is barred by section 13 of the Securities Act. The Outside Directors are accordingly entitled to summary judgment on this claim in Count One of the complaint.

In considering the merits of the Outside Directors' contentions regarding the other allegations of the complaint, it is important to note the specific material misrepresentations and omissions that plaintiff HB&T alleges were made with the participation, knowledge, and involvement of the Outside Directors. In connection with HB&T's participation in HFI's New Georgia loan pool, the plaintiff alleges that certain entities and parties fraudulently misrepresented that HBI would repurchase HB&T's participations on demand; that HBI would cause its affiliate banks to maintain time deposits at HB&T in an amount sufficient to fund the participation; that the participations would convey a beneficial ownership interest in the loan documents and collateral held by HFI for the loans covered by the participations; and that HFI would report periodically to HB&T by sending it monthly statements of account.

The plaintiff alleges that there were material omissions as follows: HBI had allegedly decided to get out of the factoring business and the Atlanta commercial loan market and, in order to effectuate that decision, had decided that HFI would cease accepting new business, withdraw from the Atlanta market, reduce its staff, and be liquidated as soon as possible. All of this was allegedly not disclosed. It was allegedly not disclosed that the loans in question had been previously participated to HNB and were allegedly being sold to the plaintiff as part of a crash program within the entire HBI system to reduce the loan portfolios of banking and non-banking subsidiaries and to create liquidity or the appearance of it. The offering of loan participations by HFI, HMC, and HNB to the plaintiff was allegedly motivated by the needs of HBI and HNB without regard to the best interests of the plaintiff, and this was allegedly not disclosed. It was also allegedly not disclosed that HFI was allegedly incapable of managing the loan pool properly because of alleged poor business judgment in credit decision-making, slack internal controls, lack of adequate collection efforts, inability to properly analyze and use data obtained from borrowers, and poor management generally. Another alleged omission was that HFI did not intend to manage the New Georgia loans after the plaintiff entered into the loan participation agreement, but instead intended to sell them as soon as possible to some other entity. A final alleged material omission is that HFI was allegedly aware of facts relating to the risky character of the New Georgia loans, the condition of the borrowers, and the security for the loans which allegedly were not contained in loan files inspected by plaintiff HB&T.

■ After carefully reviewing the record in this action, the Court concludes that there is no genuine issue as to any fact material to the issue of whether or not the Outside Directors participated, aided, abet-

ted or assisted in the alleged securities sale, fraud or violations. The evidence in the record shows that the Outside Directors did not do so. In its response to the Outside Directors' interrogatories, plaintiff HB&T states that defendants Mahone and Brennan are the only defendants who are alleged to have made any misrepresentations. In addition, the plaintiff indicated that there is no evidence that any defendant other than defendants Youmans, Holliday, Garner, and Chepul were involved in any way with the alleged sale. The depositions taken by the plaintiff and all the defendants' answers to interrogatories confirm this.

As to the Outside Directors' knowledge of the plaintiffs' participation in loans made by HFI, it appears that none of these directors learned of the participation until more than four months after the September 20, 1974 loan participation agreement was entered into between the plaintiff and HFI. Defendants Hamilton, Smith, Lancaster, Patten, and Smartt, and deceased Carmack Cochran first learned of the participation sale at the HBI board meeting on February 5, 1975, through statements made by defendants Youmans and Chepul.[8] Defendants Johnson, Thatcher, and Hutcheson (plus the six directors mentioned above) received information regarding the plaintiffs' participation in HFI's loans at the HBI board meeting on March 12, 1975, through statements made by defendant Holliday.[9] Defendant Finley (plus the other Outside Directors) apparently read or may have read, sometime shortly after March 12, 1975, the statement in HBI board minutes for that date that "commercial finance loans are the financing of clients' accounts receivable, the majority of which are participated into the Hamilton Bank and Trust Company of Atlanta."[10]

The record indicates that the foregoing information was the full extent of the Outside Directors' knowledge about the plaintiffs' participation in HFI's loans prior to

---

8. See pp. 1246 -1247 of Appendix A.

9. See Appendix B.

10. See Appendix C.

the filing of the complaint in this suit. As counsel for the Outside Directors contends, the knowledge acquired by the Outside Directors at the February and March board meetings, in addition to the directors' general knowledge about problems in the North Georgia real estate market and HBI's loan reduction program, is *all* there is to link the Outside Directors to the plaintiff's purported case. Plaintiff HB&T denies the Outside Directors' well supported factual assertions in this regard, but the plaintiff has failed to support its denials with contrary evidence. Such mere denials do not create genuine issues of material fact, since once the moving party has properly supported his summary judgment motion, the nonmoving party must rebut with "significant probative" evidence to show that there are material factual issues. *Ferguson v. National Broadcasting Company, Inc.,* 584 F.2d 111, 114 (5th Cir. 1978).

■ Accordingly, there being no genuine issue of material fact, the Court concludes that the Outside Directors are entitled as a matter of law to summary judgment on the plaintiffs' claims that the Outside Directors participated, aided, abetted or assisted in the alleged sale of securities, the alleged fraud, or the alleged violations of the securities laws. In the Court's view, this conclusion completely disposes of the plaintiff's common law fraud claim in Count Nine of the complaint. In *Lincoln Land Co. v. Palfery,* 130 Ga.App. 407, 203 S.E.2d 597 (1973), a case involving alleged common law fraud on the part of individuals serving both as officers and directors of a corporation, the Georgia Court of Appeals adopted the Maryland rule that "an officer of a corporation who takes no part in the commission of a tort committed by the corporation is not personally liable unless he specifically directed the particular act to be done or participated or co-operated therein." 130 Ga. App. at 411, 203 S.E.2d at 603, *citing Levi v. Schwartz,* 201 Md. 575, 583, 95 A.2d 322 (1953). *Accord, McLanahan v. Keith,* 135 Ga.App. 117, 121, 217 S.E.2d 420 (1975). Presumably, the Georgia Court of Appeals intended that this rule also apply to directors of a corporation, since *Lincoln Land*

*Co.* involved alleged fraud by individuals who were both directors and officers. This principle is consistent with the universal rule on the subject, as stated in 37 Am. Jur.2d *Fraud and Deceit* § 322, at p. 425:

> The cases are agreed that a director or officer of a corporation is not liable, merely because of his official character, for the fraud or false representations of the other officers or agents of the corporation or for fraud attributable to the corporation itself, if such director or officer is not personally connected with the wrong and does not participate in it. (Footnote omitted)

The remaining claims in this case against the Outside Directors relate to the plaintiff's allegations that the Outside Directors (1) controlled the persons who were allegedly involved in the alleged sale, fraud or violations; (2) knew or had reason to know of the alleged sale, fraud, or violations; and (3) induced and did not act in good faith with respect to the alleged misrepresentations and omissions at issue in this action. For the purposes of their motions for summary judgment, the Outside Directors do not dispute the plaintiff's contention that these directors were controlling persons. The Outside Directors maintain, however, that they are exempt from liability as controlling persons under the securities laws. As to the plaintiff's other allegations, the Court agrees with the Outside Directors' contentions that they acted in good faith and did not induce or have knowledge of the alleged sale, fraud, or violations. The evidence in the record clearly supports the Outside Directors' contentions, and the plaintiff has failed to present any evidence in support of its assertions that there are genuine issues of material fact in regard to the directors' knowledge or actions. Thus, the plaintiff's unsupported allegations do not preclude the grant of a summary judgment in favor of the Outside Directors as to these claims. *Gossett v. Du-Ra-Kel Corporation,* 569 F.2d 869, 871-73 (5th Cir. 1978); *Central Oil & Supply Corp. v. United States,* 557 F.2d 511, 515 (5th Cir. 1977).

The real issue confronting the Court is the legal question of whether the Outside Directors had reason to know of the facts by reason of which liability is alleged to exist. The pertinent provisions of the federal securities laws in this regard are section 15 of the Securities Act, 15 U.S.C. § 77 o, and section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). The pertinent state law provision is section 15(b) of the Georgia Securities Act of 1973, Ga.Code Ann. § 97–114(b).

> Section 15 of the Securities Act provides: Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77 *l* of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, *unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.* (Emphasis added.) 15 U.S.C. § 77o.

Section 20(a) of the Exchange Act provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, *unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.* (Emphasis added). 15 U.S.C. § 78t(a).

Section 15(b) of the Georgia Securities Act similarly states that "[e]very person who directly or indirectly controls a person liable under subsection (a) above  .   .   . [is] liable jointly and severally with and to the same extent as the person liable under subsection (a) above unless the person whose liability arises under the provisions of this subsection (b) sustains the burden of proof that he did not know and in the exercise of reasonable care could not have known of the existence of the facts by reason of which liability is alleged to exist." Ga.Code Ann. § 97–114(b).

The Court is unaware of any federal cases which are directly on point with the instant action. The case of *Lanza v. Drexel & Co.,* 479 F.2d 1277 (2d Cir. 1973), however, is instructive with respect to the issue of whether the Outside Directors are liable under the federal securities laws as "controlling persons." [11] *Lanza* dealt principally with the issue of whether an outside director of the BarChris Construction Company ("BarChris"), defendant Coleman, was liable for the securities laws violations of the officers and other directors of BarChris. The securities transaction involved was an exchange of all the stock of the plaintiffs' corporation for stock of BarChris, with the plaintiffs receiving the BarChris stock. In connection with the exchange of stock, the plaintiffs were found to have been misled and damaged by material misstatements and omissions on the part of certain officers and directors of BarChris. *Id.* at 1280. Coleman was present at or read minutes of the BarChris directors' meetings at which the exchange of stock was discussed and approved. *Id.* at 1284. Coleman had substantial information about the general business and financial condition of BarChris, and he believed that the company's condition during the months preceding the sale was good. *Id.* at 1285–86. Several days before the exchange of stock, however, Coleman learned of several negative financial developments at BarChris which were not disclosed to the plaintiffs. *Id.* at 1286–88. Less than one year after the exchange, BarChris filed a petition in bankruptcy. The plaintiffs unsuccessfully brought a rescission action against the trustee in bankruptcy and subsequently brought an action for damages against former officers and directors of BarChris. *Id.* at 1280.

11. *Lanza* was decided en banc by the Second Circuit and has been universally followed.

The district court held that certain officers and directors of BarChris were liable to the plaintiffs under the securities laws, but the court rejected the plaintiffs' claim that defendant Coleman violated section 10(b) of the Exchange Act and rule 10b–5 promulgated thereunder, concluding that:

The claim fails because of two . . . propositions—one of fact, the second of law:

(1) Coleman neither participated in nor knew of any deception practiced upon the plaintiffs;

(2) in the circumstances disclosed by the record, he was under no duty to investigate more than he did at the material times or to seek out and advise the plaintiffs in any way.[12]

The Second Circuit affirmed the district court's finding of fact quoted above and also affirmed its legal conclusion, stating:

We conclude that a director in his capacity as a director (a non-participant in the transaction) owes no duty to insure that all material, adverse information is conveyed to prospective purchasers of the stock of the corporation on whose board he sits. A director's liability to prospective purchasers under Rule 10b-5 can thus only be secondary, such as that of an aider and abettor, a conspirator, or a substantial participant in fraud perpetrated by others. Because Coleman owed no duty as a director to insure that they [the plaintiffs] received information not conveyed to them by [those who participated in the fraud] and because Coleman was not an aider and abettor of, a conspirator in, or a substantial participant in the fraud perpetrated upon these plaintiffs, the complaint against Coleman . . .

was properly dismissed. [Footnote omitted.] 479 F.2d at 1289.

The Second Circuit also stated:

. . . [N]either the language nor intent of Section 10(b) or Rule 10b–5 [13] would justify a holding (1) that a director is an insurer of the honesty of individual officers of the corporation in their negotiations which involve the purchase or sale of the corporation's stock or (2) that, although he does not conduct the negotiations, participate therein, or have knowledge thereof, he is under a duty to investigate each such transaction and to inquire as to what representations had been made, by whom and to whom, and then independently check on the truth or falsity of every statement made and document presented. *Id.* at 1281.

The Second Circuit agreed with the district court's finding that even if Coleman was deemed to be a "control" person, he did not exercise that "control" to bring about the action upon which liability was based. *Id.* at 1298. Thus, the appellate court affirmed the lower court's conclusion that Coleman was not liable to the plaintiffs under section 20(a) of the Exchange Act. The Second Circuit stated in dictum that "[t]he intent of Congress in adding [section 20] was obviously to impose liability only on those directors who fall within its definition of control and who are in some meaningful sense culpable participants in the fraud perpetrated by controlled persons." *Id.* at 1299.[14]

This Court believes that, based on *Lanza*, the Outside Directors had no duty to insure that all material, adverse information was conveyed to plaintiff HB&T in connection with the sale of the loan participations to the plaintiff. As a practical mat-

---

12. [1970–71 Transfer Binder] CCH Fed.Sec.L. Rep. ' 92, 826 (S.D.N.Y.1970), at 90, 089, 90, 104.

13. For the purposes of this case, the court assumed that the requirements for a cause of action under Section 17 of the Securities Act, 15 U.S.C. § 77q, were identical to those under Section 10(b) of the Exchange Act. *Id.* at 1280 n.2. Similarly, the court said that unknowing nonparticipants cannot be held liable under

section 12(2) of the Securities Act. *Id.* at 1298–99.

14. The Third Circuit agreed with this conclusion in *Rochez Brothers, Inc. v. Rhoades*, 527 F.2d 880, 884 85 (3d Cir. 1975), in which it stated that "[t]he legislative history of Section 20(a) illustrates that Congress intended liability to be based on something besides control. That something is culpable participation."

ter, it is unrealistic to require outside directors of a corporation—*i. e.*, those who are not full-time employees of the corporation—to investigate the corporation's incidental securities[15] transactions carried on by or participated in by the corporation's officers without the directors' actual knowledge or participation. *Id.* at 1306–09. This is especially true in the case *sub judice* in which the loan participations were sold by a subsidiary of the corporation on whose board the Outside Directors sat. Furthermore, the evidence in the record shows that the Outside Directors did not have any "knowledge of or reasonable ground to believe in the existence of the facts" alleged as to misrepresentations, omissions, or fraud. The evidence also shows that the Outside Directors "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action" alleged under the Exchange Act. Section 20 of the Exchange Act, 15 U.S.C. § 78t.

Plaintiff HB&T has asserted a number of facts which it contends could easily have led to the Outside Directors' discovery of fraud in connection with the sale of loan participations by HFI to HB&T in September 1974. For example, the plaintiff contends that the Outside Directors had knowledge of certain adverse financial developments at HFI and that certain Outside Directors were concerned with defendant Youmans' style of management as chief executive officer of HBI. The plaintiff also makes certain assertions about the use of proceeds from HFI's sale of loan participations to HB&T and the use of certificates of deposit in connection with the sale as well as Theodore Hutcheson's acquisition of HB&T.

■ The Court rejects the plaintiff's contention that the Outside Directors had reason to know of the alleged misrepresentations and omissions made in connection with the sale of the loan participations by HFI to HB&T in September 1974. It is clear from the evidence in the record that the Outside

Directors did not know that the September 1974 transaction was going to occur or was occurring. They did not learn of the transaction until several months after it took place. Furthermore, it should be noted that the Outside Directors received only such information as was provided them at the HBI board meetings. Although the knowledge they acquired may have caused them to become concerned with the overall financial condition of HBI and its subsidiary, HFI, the Outside Directors were not apprised of suspicious facts and circumstances that should have put them on notice of fraud. "A director . . . is chargeable [only] with a degree of notice of those facts which the corporate books and the directors' meetings would fairly disclose." *Myzel v. Fields*, 386 F.2d 718, 736 (8th Cir. 1967), *cert. denied*, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968). In addition, a director is entitled to rely on the corporation's officers and is "not . . . required to presume rascality, maintain a constant vigilance over the corporation's business transactions, or assume the responsibilities of the corporation's managing officers." *Harmon v. Willbern*, 374 F.Supp. 1149, 1164 (D.Kan. 1974), *aff'd*, 520 F.2d 1333 (10th Cir. 1975).

It is important to note that in the context of HBI's overall loan reduction goal of $200,000,000, HFI's sale of loan participations totaling $1,800,000 to plaintiff HB&T was not a transaction which the Outside Directors of HBI could reasonably be expected to have investigated. HFI loans amounted to only $13,566,824 and constituted only two percent of the HBI system's loans. HMC, on the other hand, had extended loans totaling $211,645,972, or 31 percent of the system's loans. Of these loans, $187,000,000 had been sold to HBI banking subsidiaries, and $78,000,000 of the loans had significant collectibility problems. The condition of HMC's loans and the efforts of HMC to reduce its outstanding loans were the major problems confronting HBI's management, and HFI's relatively

---

**15.** It is assumed for purposes of this Order that the loan participations in question are securities. The issue of whether the participations are securities under the federal securities laws will be decided in a subsequent order.

insignificant sale of loan participations to plaintiff HB&T could not reasonably be expected to have alerted the Outside Directors to the fraud that allegedly occurred in connection with the transaction.

Plaintiff HB&T has also argued that the Outside Directors are liable as controlling persons for the alleged fraudulent omission made in connection with the issuance of the May 1, 1975 certificate.[16]  As was true for the September 1974 transaction, however, the Outside Directors had no actual knowledge that the May 1, 1975 certificate was going to be issued or was issued.  In addition, none of the facts raised by the plaintiff show that the Outside Directors had reason to know that the May 1, 1975 certificate would be issued or was issued, or that the Outside Directors had reason to know of any omission made in connection with the issuance of the instrument.  The full extent of the Outside Directors' knowledge about anything relating to loan participations sold by HFI to plaintiff HB&T was limited to the references to these participations at the HBI board meetings in February and March of 1975.

■ For all of the foregoing reasons, the Court believes that the Outside Directors are exempt from liability as controlling persons under section 15 of the Securities Act, 15 U.S.C. § 77o, and under section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  The Outside Directors are therefore entitled to summary judgment on the plaintiff's claims brought under Counts Two, Three, Four, Five, Six, and Seven of the complaint.  The Outside Directors are also exempt from liability as controlling persons under section 15(b) of the Georgia Securities Act of 1973, since they "did not know and in the exercise of reasonable care could not have known of the existence of the facts by reason of which liability is alleged to exist."  Ga.Code Ann. § 97–114(b).  They are therefore entitled to summary judgment on the claim brought under Count Eight of the complaint.

■ Plaintiff HB&T maintains that the Outside Directors are liable as controlling persons under the Georgia "do-nothing director" rule applicable to Ga.Code Ann. § 97–114(b), citing *Gilbert v. Meason*, 137 Ga.App. 1, 222 S.E.2d 835 (1975), *aff'd on other ground*, 236 Ga. 862, 226 S.E.2d 49 (1976), and *Boddy v. Theiling*, 129 Ga.App. 273, 199 S.E.2d 379 (1973).  In *Boddy*, the board of directors of a corporation was found to have participated in the sale of unlicensed stock, thereby rendering the directors liable to the purchasers of the stock under the Georgia Securities Act.  One outside director appealed the lower court's finding of liability on his part, contending that he had not participated in the business affairs of the corporation and had not attended any of the directors' meetings.  129 Ga.App. at 273–74, 199 S.E.2d 379.  The Georgia Court of Appeals held that the complete lack of activity by the "do-nothing director" did not entitle him to a summary judgment as a matter of law because he had failed to establish that he had exercised reasonable care as a director.  *Id.* at 276–77, 199 S.E.2d 379.

The Georgia "do-nothing director" rule is not applicable to the case *sub judice* because the Outside Directors did attend HBI directors' meetings and did exercise reasonable care in carrying out their duties.  It was the knowledge that the Outside Directors acquired at the HBI meetings rather than the lack of knowledge which forms the basis for the plaintiff's claims that the Outside Directors had reason to know of the alleged fraud and securities laws violations.  In the *Boddy* case, by contrast, the "do-nothing director" was found liable as a result of his complete lack of activity and knowledge about the affairs of the corporation for which he served as a director.

■ The principles of Georgia law set forth in *Gilbert* and *Boddy* which are more pertinent than the "do-nothing director" rule to the Outside Directors' summary judgment motions are: (1) the liability of a director who does not know of a securities law violation is determined by

---

16.  The plaintiff claims no misrepresentations in connection with this issuance.

whether "as a reasonably prudent man he would not have discovered the violation," *Gilbert v. Meason*, 137 Ga.App. at 5, 222 S.E.2d at 838; and (2) directors are entitled to "rely upon financial information of the corporation represented to them to be correct by the president or the officer of the corporation having charge of its books of account . . . ." *Boddy v. Theiling*, 129 Ga.App. at 277, 199 S.E.2d at 382. The record shows that the Outside Directors did act with "that degree of diligence, care and skill which ordinarily prudent men would exercise under similar circumstances in like positions." 137 Ga.App. at 5, 222 S.E.2d at 838; Ga.Code Ann. § 22–713. The Outside Directors also relied in good faith on the information provided them by the HBI officers at the HBI directors' meetings and were not put on notice of the fraud that allegedly occurred in connection with HFI's sale of loan participations to plaintiff HB&T.

Accordingly, for all of the foregoing reasons, the motions for summary judgment filed by the Outside Directors are hereby GRANTED pursuant to Fed.R.Civ.P. 56.

### III.  *Motion for Summary Judgment of Defendant Moon*

During the time pertinent to this action, defendant Moon was a director of HBI, but was never an officer or employee of HBI. He was never an officer, director, or employee of HFI, HMC, HNB, or any other subsidiary of HBI. For all the reasons set forth in support of the Court's decision to grant the motions for summary judgment filed by the Outside Directors, defendant Moon's motion for summary judgment is hereby GRANTED pursuant to Fed.R. Civ.P. 56.

### IV.  *Motion for Summary Judgment of Defendant Bruegge*

Defendant Bruegge was a director and officer of HBI during the time pertinent to this action. He was also a director and president of HNB, but was not an officer, director, or employee of HFI, HMC, or any other subsidiary of HBI. A review of the record in this case indicates that there are genuine issues of material fact with respect to defendant Bruegge's alleged liability under the federal and state securities laws. Accordingly, the Court DENIES defendant Bruegge's motion for summary judgment as to all the plaintiff's claims except for the claim in Count One of the complaint which is time-barred.

### V.  *Motion for Summary Judgment of Defendant Heffner*

Defendant Heffner was executive vice-president of marketing of HBI from July 2, 1973, to April 1, 1975, but was not a director of the corporation. Heffner was also a nonvoting member of the HBI executive committee from May 8, 1974, to April 1, 1975, and his duties and responsibilities involved business development, advertising, sales training, and public relations for the banks controlled by HBI. In support of his motion for summary judgment, defendant Heffner contends that: (1) he had no knowledge of the loan participations sold by HFI to HB&T; (2) he did not participate in the sale and exercised no control or influence over the sale; and (3) he had no functional responsibilities involving HFI, HMC, or any loans or loan participations.

The evidence in the record indicates that defendant Heffner's contentions are meritorious. The affidavit of defendant Youmans, the president and chairman of the board of HBI, corroborates defendant Heffner's assertions that he neither took any action in connection with HFI's sale of loan participations to HB&T nor exercised any control or influence over the sale. Furthermore, although defendant Heffner became aware of HBI's system-wide loan reduction activities through his attendance at HBI executive committee meetings, there is no indication in the committee minutes that the loan participations at issue were ever discussed at these meetings. Finally, plaintiff HB&T has failed to cite any testimony or documents which (1) implicates defendant Heffner in the sale of the loan participations, (2) shows that Heffner had any knowledge of the existence or sale of these

loan participations prior to the initiation of this suit, or (3) establishes that the loan participations came within Heffner's duties and responsibilities.

Therefore, the Court concludes that there are no genuine issues of material fact regarding defendant Heffner's alleged participation, involvement, or control. The evidence in the record clearly shows that the defendant did not know of, participate, aid, abet, assist, or act as a "controlling person" in connection with the alleged sale of securities or the alleged fraud or securities laws violations. Defendant Heffner is therefore entitled as a matter of law to summary judgment in his favor on the plaintiff's claims. Accordingly, defendant Heffner's motion for summary judgment is hereby GRANTED pursuant to Fed.R.Civ.P. 56.

## VI. Motions for Summary Judgment of Defendants Youmans and Mahone

Defendants Youmans and Mahone have moved for summary judgment on the ground that the Court lacks subject matter jurisdiction of the claims set forth in the complaint because the alleged commercial loan transaction described in the complaint does not involve a "security." The defendants have also moved for summary judgment with respect to the plaintiff's registration claim in Count One of the complaint on the ground that it is time-barred. The Court hereby GRANTS the defendants' summary judgment motions as to the registration claim in Count One of the complaint because it is barred by the statute of limitations. The Court will defer ruling on the defendants' motions for summary judgment with respect to the plaintiff's other claims, however, since the defendants' motions raise issues reserved by the Court's order of September 21, 1978, for additional discovery and later determination. If the parties remaining in this action do not wish to engage in additional discovery with respect to the issues raised by the summary judgment motions of defendants Youmans and Mahone, then they should so advise the Court in order to expedite a ruling on the remaining issues in this suit.

## VII. Motion for Summary Judgment of Defendant Barrett

Defendant Barrett was a director of HBI and was also the president and a director of HMC. He was not an officer, director or employee of HFI. Defendant Barrett has moved for summary judgment on the same grounds as those set forth by defendants Youmans and Mahone. Defendant Barrett has also moved for summary judgment on the grounds that he did not participate, aid, abet, or assist in the alleged securities sale, fraud, or securities laws violations and also did not act as a controlling person of anyone who did engage in such alleged acts.

The Court believes that there are genuine issues of material fact with respect to the plaintiff's allegations that defendant Barrett is liable for his alleged participation, involvement, and control in connection with the alleged sale, fraud, or violations. The Court therefore declines to grant defendant Barrett's motion for summary judgment on the basis of his claimed lack of participation, involvement, and control. In addition, the Court hereby defers consideration of the issues raised by the jurisdictional argument in defendant Barrett's motion for summary judgment, but GRANTS Barrett's motion as to the registration claim in Count One of the complaint.

## VIII. Motions for Summary Judgment of Defendants Brennan, Garner, and Sweetin

Defendants Brennan, Garner, and Sweetin have moved for summary judgment on the grounds that (1) there is no "security" in this case to support subject matter jurisdiction, (2) the defendants did not participate, aid, abet or assist in the alleged sale, fraud or securities laws violations, and (3) the plaintiff's registration claim is barred by the statute of limitations and because of certain statutory exemptions.

For the reasons set forth earlier in this order, the Court hereby defers consideration of the issues raised by the jurisdictional argument in the defendants' motions for summary judgment, but GRANTS the de-

fendants' motions as to the plaintiff's registration claim in Count One of the complaint. The Court believes that there are genuine issues of material fact with respect to the plaintiff's allegations of participation, involvement, and control on the part of the defendants, and the Court therefore DENIES the summary judgment motions of defendants Brennan, Garner, and Sweetin as to all counts in the complaint except for the first count.

## APPENDIX A

### TRANSCRIPT FROM PORTION OF A TAPE OF A MEETING OF THE BOARD OF DIRECTORS OF HAMILTON BANCSHARES ON FEBRUARY 5, 1975

*Rountree Youmans:* . . . The next thing I have on the agenda is to discuss the mortgage company and the factoring company, and before we get into the mortgage company, let me discuss the operations of the factoring company. The biggest mistake that we have made since I've been with this organization was in hiring John Brennan to head up the factoring company. I hate to say it like this, but it's true. John absolutely has not done a good job. He did not do—uh—well, his judgment is certainly not good and we are going to have some losses in the factoring company. There is no question about it. Now, we would have losses anyway, because the timing of organizing a new factoring company was terrible, as you know. None of us, including me, knew in January of last year that the economic situation was going to turn around the way it did. And as everyone of you will remember, that we said at that time that this was the most dangerous thing that we had ever done. And it's worked out just that way. The very first client we put on our books was a client that was broke before we took them. It was a furniture company in North Carolina, Claremont Furniture Company, and as it turned out, they really, uh, were absolutely insolvent when we took them over. It is now said pretty openly in whatever town they're in in North Carolina that this company was con-

trolled by the Mafia. And be that as it may, uh, our people are talking with the FBI today in Atlanta on my instructions to see what information we can get and to get them to work with us and cooperate with us. There are a lot of facts I don't understand about this loan. Arthur Andersen, we, we set, have set up a million three hundred thousand dollars already in reserve for losses on loans in the factoring company. Arthur Andersen feels this is not sufficient and I hate to admit it, I kind of agree with them. They are asking for an additional five or six hundred thousand dollars and we may just need every penny of it before we liquidate this company. Now I do have a memorandum here from Tom Mahone—who, incidentally, he and Don Carr, his top credit man who works with him, and both of them are spending full time there—which shows that our past dues in this company are no greater than they are in here compared to the C and S factoring company and other factoring companies that have been in business for years. And in our position of liquidating this company, I'm surprised that our past dues are not greater. We have four or five smaller companies in here that are finding it real difficult to get anybody else to factor them. We're going to have to work with them for awhile. We quite possibly will have most of the outstanding money collected here within the next 3 to 5 months. Um, the, hopefully, the, this additional reserve that we are setting up will get us out of this operation without any additional loss. Wendell, is there any additional remarks you might like to make on that subject or have I covered it fairly well?

*T. Wendell Holliday:* I think you have, Rountree. Obviously on the past due situation we're giving strong attention to it which ah . . .

*Rountree Youmans:* You did read this memorandum?

*T. Wendell Holliday:* Yes.

*Rountree Youmans:* And which was right encouraging as far as the past due is concerned. Now on the mortgage operation, before I . . .

*W. D. Moon, Jr.:* Mr. Youmans.

*Rountree Youmans:* Yes sir.

*W. D. Moon, Jr.:* Excuse me, sir. I can't understand this Factors' balance sheet that shows participations minus four million.

*Rountree Youmans:* Well, I would assume that . . .

*Richard A. Chepul:* Let me . . . Doc, of the total five million, five ninety eight of loans, factoring company has sold participations to Hamilton Bank and Trust of Atlanta and Hamilton National Bank of Chattanooga—has sold participations to both those banks of four million, five, so that they're carrying a million 0 sixty-five of loans on their books themselves. The rest of it is the four million they've participated out.

*Rountree Youmans:* Does that answer your question?

*W. D. Moon, Jr.:* Yes sir, I just didn't understand why it was in brackets.

*Richard A. Chepul:* Well, what we tried to do on these, just like in the mortgage company statements, Doc, what we try to do is we try to show the gross loans generated by this, by the specific company and then we sh__ we've netted out the participations sold to show what the net loans are they're carrying on their books.

*W. D. Moon, Jr.:* Well, does Arthur Andersen think then that, by pumping another five hundred in it, we could come out even—with no liabilities outstanding?

*Rountree Youmans:* Ah, Mr. Moon . .

*W. D. Moon, Jr.:* We intend to liquidate, of course, when _____ advise us to do so.

*Rountree Youmans:* Mr. Moon, I would hate to speak for Arthur Andersen. It's sort of like the mortgage loan situation. It would be awfully difficult for Arthur Andersen or for me, if you ask me a direct question today, to say that that would be adequate or that it would be, probably, entirely too much. I mean, I couldn't answer it either way. Uh, you take your factoring company here—we have lawsuits against the principals in the Claremont Furniture Company that I'm talking about. Our people now in the factoring company feel that we are going to recover very little from it even though they represent a very sizeable net worth. I have no idea what the outcome will be. We have assets in the bankruptcy court which we feel we're entitled to, but we're not absolutely sure whether we're going to get them or not. I don't believe Arthur Andersen would say, would they Dick, that they feel definitely that this will be enough or too much. I do feel that, ah, I—at this moment, I feel we're going to need every penny of it.

*W. D. Moon, Jr.:* Are the participations sold without recourse? Is there any liability . . . ?

*Rountree Youmans:* They are sold, they are sold without recourse, but unfortunately, Doc, most of that four million dollars is in the Hamilton Bank of Atlanta and they're just as good as gold. There's no problem whatever. There are three or four people who want companies who want those, including the Hamilton Bank of Atlanta.

*W. D. Moon, Jr.:* No problem of the participations coming back on . . . anybody.

*Rountree Youmans:* No, except whatever we've got in Chattanooga. You know that, ah, and I shouldn't say this and you better not put it in the minutes you know durn well that if we have one that goes bad in Chattanooga, we're not going to let Chattanooga take a loss. I shouldn't have said that, should I? Okay (laugh), well anyway, legally we have no liability Mr. Moon. Now, on the mortgage corporation . .

## APPENDIX B

EXCERPT FROM TRANSCRIPT OF TAPE RECORDING OF HAMILTON BANCSHARES, INC. BOARD OF DIRECTORS' MEETING ON MARCH 12, 1975

[Transcript up to this point is here omitted]

*Whitaker:* Well, if there are no further questions about that, I will ask Wendell to comment on the Factoring Company.

*Holliday:* The portfolio in the Factoring Company: first, I will give you totals and how it has performed since December 31, the total loans, and I will give you net, because we have some participations sold out. December 31: our net loans $13,566,-000. At the end of January it was $12,282,-000, and at the end of February $11,600,000. It's coming down rather slowly. The loans are made up of . . . I will give you February 28 ending total: factored accounts receivable $5,810,000; advances to factoring clients, this is over advances, of $4,345,000; and gross miscellaneous loans (and these are mostly accounts receivable, aren't they Dick?) $5,865,000, less $4,421,000 which has been participated [in] either into the Hamilton National Bank of Chattanooga or Hamilton Bank and Trust of Atlanta. I really think that breaks about half and half. $2,000,000 is carried here and $2,500,-000 in the Atlanta bank, for a net of $1,444,000.

*Hutcheson:* Accounts receivable?

*Holliday:* Yes sir. It's listed here as miscellaneous time loans and commercial financed loans. Some of this, the miscellaneous time loans, are direct loans to the factoring clients, usually secured by inventory, mortgages on land and mortgages on building. I believe we do have some probably open loans in there, but I can't give you the answer on that. That portion of it is $3,100,000. The straight commercial finance, which is accounts receivable, total $2,721,000; and it is that sector, I believe, that is participated in the Hamilton Bank and Trust in Atlanta. These two categories total $5,865,000, with participations sold of $4,421,000, leaving the factoring company with a net of $1,444,000.

*?:* This is as of what time?

*Holliday:* February 28th.

*Hutcheson:* Now you first gave us accounts receivable $5,800,000.

*Holliday:* That's factors accounts receivable.

[Discussions of factored accounts receivable and liquidation of HFI are here omitted]

*?:* Is there any possibility of selling the Factoring Company as a going concern to any other factoring company?

*Holliday:* No. We tried very hard. We talked to two or three. They would have taken it over and liquidated it for a fee. They were not interested in enough of the clients to come in and buy it as a going concern. There has been discussion that I have not been involved in relative to the accounts receivable, the $2,700,000 in accounts receivable, to sell those which are participated in to the Hamilton Bank in Atlanta. I think we all anticipate . . .

*Whitaker:* Wendell, we will all know more on this next week because Tom Mahone is coming up here Monday to go over this thing. We haven't been in close touch to it as he has or as Rountree has as far as I'm concerned.

*Holliday:* It's been about two weeks since we have had a really good update on the operations.

[Remainder of transcript is here omitted.]

APPENDIX C

EXCERPT

HAMILTON BANCSHARES, INC.
SPECIAL MEETING OF THE
BOARD OF DIRECTORS
MARCH 12, 1975

A Special Meeting of the Board of Directors of Hamilton Bancshares, Inc. was held March 12, 1975 at 1:00 P.M. in the Board Room of the Hamilton National Bank of Chattanooga.

Mr. Whitaker called the meeting to order after determining a quorum was present, those directors present being:

| | |
|---|---|
| T. W. Holliday | John L. Hutcheson, Jr. |
| H. Clay E. Johnson | W. D. Moon, Jr. |
| J. Polk Smartt | Z. Cartter Patten |
| Blackwell Smith, Jr. | Richard C. Thatcher, Jr. |
| John Vorder Bruegge | J. E. Whitaker |
| Philip S. Barrett | W. Hanes Lancaster, Jr. |
| Carmack Cochran | David Hamilton |

Mr. Whitaker opened the meeting by reading a resolution to the effect that Mr. N. Rountree Youmans had been replaced as Chairman of the Board of Hamilton Bancshares, Inc. and The Hamilton National Bank of Chattanooga by J. E. Whitaker, and T. Wendell Holliday was made President of Hamilton Bancshares, Inc. and John Vorder Bruegge made Chief Executive Officer of The Hamilton National Bank of Chattanooga. The news release announcing this action had been read to each Director of Hamilton Bancshares, Inc. and approved by them as of March 10, 1975. Mr. Whitaker advised the Board that the Federal Reserve, Comptroller's Office and FDIC has been notified of this action. It was moved that said resolution be accepted and the Board unanimously approved acceptance. Said resolution is attached to and made a part of these minutes.

The minutes of the last two Board Meetings and the last Executive Committee meeting were reviewed by the Board and discussed. Mr. Moon stated he had advised the Board at the . . .. [Pages 2–4 are omitted from this excerpt.]

On land acquisition loans, they are being paid off very slowly and will continue at this pace until employment starts up. We are about to be paid off on a $600,000 land loan in North Fulton County, and have been paid off on a $255,000 land loan which was sold to Colonial Stores.

Mr. Holliday then reviewed the reduction in loans in the Factoring Company since December 31, 1974, the breakdown of the type of loans as of February 28, 1975, the past due status of the loans as of February 28, 1975 and the reduction of factoring clients since December 31, 1974. Schedules reflecting what Mr. Holliday reviewed are attached to these minutes. He stated that the loans are coming down very slowly as we are having to continue to factor for clients that have as yet not made arrangements with another factoring company to finance their business. He then explained the miscellaneous time loans shown on the schedules are direct loans to factoring clients secured by inventories, mortgages on land and buildings, and other various collateral. In addition, commercial finance loans are the financing of clients accounts receivable, the majority of which are participated into the Hamilton Bank and Trust Company of Atlanta. He stated that the past due loans were comparable to other factoring companies according to our information. The largest exposure for loss we have is our loans to Clairmont Manufacturing Company of Hickory, North Carolina. This company is in bankruptcy and we are presently in litigation with the principals who have guaranteed the loans.

He stated that we have contractual arrangements with each client which mature one year from the date of the contract. . . . [The remaining pages are omitted from this excerpt.]