Michael SEALE, Plaintiff,

v.

Leon MILLER, individually and as an officer and employee of Alta Verde Industries, Inc., Chip Miller, individually and as an officer and employee of Alta Verde Industries, Inc., Alta Verde Industries, Inc., Alta Verde Industries, Inc. under the doctrine of respondeat superior, and Miller Finance Company, Inc., Defendants.

No. 1:87–CV–272–RHH.

United States District Court,
N.D. Georgia,
Atlanta Division.

June 3, 1988.

Adam Gillespie Jett, Jr., Jett & Liss, Atlanta, Ga., Rex P. Cornelison, III, Roswell, Ga., for plaintiff.

M. Jerome Elmore, Bondurant Mixson & Elmore, Atlanta, Ga., Thomas A. Harwood, Harwood & Dulin, Uvalde, Tex. for defendants.

## ORDER

ROBERT H. HALL, District Judge.

Currently before the court in this case is defendants' motion for summary judgment, or in the alternative, for dismissal. This is a suit by a disgruntled investor who sought to shelter taxable income and sought potential profit through investing in a cattle feeding and sales program.

FACTS

A. PARTIES

The plaintiff is a resident of Atlanta, Georgia. Defendant A.L. ("Leon") Miller, Jr. is a resident of Eagle Pass, Maverick County, Texas. Leon Miller is President of Alta Verde Industries Inc. and Miller Finance Company, Inc. Defendant A.L. ("Chip") Miller, III is Vice–President of Marketing for Alta Verde Industries, Inc., and Vice–President of Miller Finance Company, Inc.

Defendant Alta Verde Industries, Inc. ("Alta Verde") is a Nevada corporation doing business in Texas and engaged in the sale of cattle and cattle management services. Alta Verde produces and sells cattle feed, and enters into contracts, known as cattle feeding agreements, whereby it holds and feeds cattle for their owners' accounts. Alta Verde operates two feedlots in Eagle Pass, Texas which are separated by over fifteen miles. Alta Verde advertised its cattle feeding program in several national and local newspapers and magazines including: *Barrons; The Palm Springs Desert Sun; The New York Times; The Los Angeles Times;* and *The Wall Street Journal.* Alta Verde purchased mailing lists, and used these lists in mailing correspondence and advertising material promoting investment in the Alta

Verde cattle feeding program. Alta Verde did not register the program at issue here with the Securities and Exchange Commission; the Georgia Securities Commissioner; or the Texas Securities Commission or any other securities regulating office in Texas. Defendants deny that this was required by law.

Because of the nature and volume of its advertising and solicitations, Alta Verde is unable to identify all offerees of its cattle feeding program. Alta Verde sells interests in or receives investments from investors in its Alta Verde cattle feeding program for the purpose of allowing the investor to become a *bona fide* cattle feeder in the business of feeding cattle to enable the investor to qualify for certain tax benefits. Alta Verde, Chip Miller and Leon Miller promote the cattle feeding program as a tax shelter offering potential tax benefits of multiple write-offs during the year of investment by the investor. A central feature in the program as promoted by the defendants is that the investor becomes a cash basis cattle feeder for tax purposes, in the legitimate business of feeding cattle for a potential profit. The program is structured so that the investor makes an initial equity investment of approximately 20% of the purchase price, and the balance is financed either through outside sources, or in the case of many of the investments, through Miller Finance.

Alta Verde purchases cattle which are in turn sold to the investor. The investor makes his equity investment in the cattle at a price which is determined by the price of the cattle at the time of purchase by Alta Verde plus the expense of feed and maintenance of those cattle prior to the investor's initial investment. The investor is provided a limited number of preselected pens from which to select his investment initially; the cattle are not automatically weighed at the time of the investment, nor at any time following, until the sale of the cattle. Defendants contend that customers have the option of requesting that their cattle be weighed, and that some customers have exercised that option. No experience is necessary for a potential investor to become a "feeder". The investor need only make the initial investment decision, approve the sales price and date at the conclusion of any particular program. The investors are not precluded from being more involved if they so desire. Alta Verde provides all feed and maintenance of the cattle for the investor and charges the investor's account with the expenses for feed and maintenance, as well as interest on the outstanding balance.

Alta Verde offers a "turnkey" program wherein it buys the cattle, feeds the cattle, and markets the cattle for the investor. According to its literature, Alta Verde charges no management fee, but instead makes a profit on the feed, much of which it grows and processes itself. Alta Verde has specialized knowledge in selecting cattle to be purchased and in fattening this cattle and uses this knowledge in caring for the purchased cattle so as to increase the value of the cattle. Alta Verde offers to provide the following: all care of the cattle; purchase of the cattle; facilities for maintaining the cattle; and expertise to maximize weight gain of the cattle in relation to the cost of maintenance. With regard to any given investor, Alta Verde typically makes the decision what cattle to buy and what price to pay. Alta Verde controls what to feed the cattle, the amounts to be given and the feeding schedule. Alta Verde decides what veterinary services, monitoring and other services are necessary, where the cattle are kept, and the number to be kept in each pen. Defendants specifically admit that Alta Verde decides when the cattle are ready for sale. Alta Verde disposes of cattle which do not perform properly with regard to weight gain.

Alta Verde promotes the feeding cycle as 120 to 150 days, with cattle being fed to an ideal weight. Alta Verde also solicits bids for sale of the cattle, notifies the investor as to these bids, and obtains the investor's authority to sell the cattle. Plaintiff contends that Alta Verde has power of attorney to sell the cattle without authorization. Alta Verde admits that this is its standard practice under its Cattle Feeding Agreement. However, Alta Verde contends that

plaintiff never entered such a written agreement and that there is no evidence as to the contents of the alleged oral contract on this point between the parties. Alta Verde sells the cattle, subject only to authorization by the investor, and credits the investor's account with the proceeds of the sale. Alta Verde then remits any credit balance to the investor, or demands payment of any deficit in the account.

Alta Verde is a limited partner in Alta Verde Beef Pack, Ltd., a Texas limited partnership which leases facilities from Alta Verde for the purpose of slaughtering and packing beef cattle. Alta Verde Beef Pack was in operation for some portion of the period between December 1985 through August 1986 and purchased cattle from investors in the Alta Verde cattle feeding program. Purchases by Alta Verde Beef Pack of investors' cattle were portrayed by Alta Verde to potential investors in the cattle feeding program as a benefit of the program.

Defendant Miller Finance Company, Inc. ("Miller Finance") is a Texas corporation engaged solely in the business of providing cattle feeding and maintenance loans to persons who wish to purchase cattle from Alta Verde and to feed that cattle at the Alta Verde feedlots in Maverick County, Texas. Miller Finance is a wholly owned subsidiary of Alta Verde. As noted above defendants Leon and Chip Miller were officers of Miller Finance. Miller Finance had no employees, facilities, or assets apart from those of Alta Verde.

During the period from December 1985 through August 1986, a company known as KLM Industries, Inc. owned cattle personally and fed those cattle on Alta Verde's feedlots. Likewise, Leon Miller owned cattle personally through Miller Feeders, Inc. from time to time during the period from December 1985 through August 1986 and fed those cattle on Alta Verde's feedlots.

## B. CONTRACT

In the spring of 1985, plaintiff met an Atlanta real estate sales agent, Leland Thomas Hall, who was attempting to sell a valuable piece of property located north of Atlanta. Mr. Hall solicited plaintiff, who was a real estate broker, for assistance in selling the property. Plaintiff was successful in finding a purchaser for Mr. Hall's sales property. Plaintiff earned a commission of about $139,000.

At the time of the closing of this real estate deal and the paying of the commissions, Mr. Hall was in the process of investigating the cattle sale and feeding operation at Alta Verde as a prospective investor. Mr. Hall discussed the operation with plaintiff, and recommended that Alta Verde contact the plaintiff. Both plaintiff and Mr. Hall hoped that purchase of cattle from Alta Verde and entry into a cattle feeding agreement would allow them to defer income from the current to the next tax year. At about the same time, Alta Verde mailed basic information about the operation to plaintiff.

Plaintiff on December 12, 1985, accompanied Mr. Hall on a trip to Eagle Pass, Texas, the location of Alta Verde's feedlots. While at Alta Verde plaintiff and Hall participated in a meeting with Chip Miller. Chip Miller understood that the plaintiff's purpose in visiting was to accompany Mr. Hall and to determine whether or not he would invest in Alta Verde cattle feeding himself. There were no private meetings between plaintiff and any of the defendants. At this meeting, plaintiff was given a copy of the Alta Verde cattle feeding agreement as well as documents relating to financing arrangements for the purchase of cattle and feed. Plaintiff was given reports identifying him as "owner" and entitled "incoming cattle breakdown for lot # 55.17S," and "incoming cattle breakdown for lot # 55.29S," along with Invoice No. 6265 of December 6, 1985, referencing lot 55.17 and lot 55.29 "Sold to: Mike Seale, 4450 Northside Drive, Atlanta, GA 30327." Chip Miller also provided plaintiff with a document entitled "Estimated Feeding Projections for the week of 12/9/85." During the course of the visit, Chip Miller personally gave plaintiff a tour of the North Feedlot. Plaintiff contends that during the tour Chip Miller identified certain pens of cattle to plaintiff as being

the cattle preselected for plaintiff. Defendant Chip Miller denies this. Defendants admit however that they had preselected "Lot 55.17S and Lot 55.29S," for plaintiff on December 6, 1986. None of the cattle identified in these two lots were at any time on the North Feedlot, but were instead on the South Feedlot. At no time did Chip Miller take or direct plaintiff to the South Feedlot.

In the document entitled "Estimated Feeding Projections for the week of 12/9/85" defendants projected an estimated market date of March 1, 1986, for a pen of 175 Holstein Steer Calves, whose average weight was 300 pounds, and whose average purchase price was $80.00 per hundred weight; and further, defendants projected a profit of $5,234.30, a 1985 tax deduction of $71,542.94, and a tax deferral ratio of 2.73. Defendants counter that these were not projections for the specific pen of cattle purchased by plaintiff.

Plaintiff contends that Chip Miller told him that the cattle in the preselected pens would be sold no later than March 1, 1986. Chip Miller denies this. Plaintiff also contends that he relied on the projection in making his investment because the specifications of the preselected pen and the pen in the projections were almost identical. Defendants point out that the pens were not identical and argue that the differences in plaintiff's pen, average weight of 294 pounds and a purchase price of $88.02 per hundred weight, are significant. Plaintiff contends that defendants made no reference to any variance in the profit expectations from those projected in the "Estimated Feeding Projections for the week of 12/9/85" when in fact the purchase price paid by the plaintiff was higher than that projected. In addition to the differences noticeable on the face of the document, defendants counter that the projection contained the following language: "This information is based on current market estimates and should not be considered as a guarantee of future prices, performances or results."

Between December 29 and 31, 1985, plaintiff contacted Leon Miller for the purpose of determining the best method of transferring money from plaintiff to Alta Verde demonstrating his interest in entering into the transaction with Alta Verde. The parties agree that on or about December 31, 1985, plaintiff entered into a valid contract with Alta Verde for the sale of cattle, feed and cattle management services. The exact terms of the contract are in dispute. Plaintiff transmitted $27,750.00 to Alta Verde as partial payment for his purchase from Alta Verde. The remainder of the purchase price was financed at that time by Miller Finance; however, plaintiff never signed a note for this indebtedness. At the time of the transaction, plaintiff was aware of the fact that Alta Verde would establish the price of the feed to be consumed by the cattle. Plaintiff was made aware of the existence of Alta Verde Beef Pack. The parties dispute whether plaintiff was told by Chip Miller during the visit that the Alta Verde Beef Pack operation was due to resume operations prior to March 1, 1986, and would provide a competitive market for plaintiff's investment.

Alta Verde fed and maintained the cattle from December 31, 1985 through August 1986 and charged an account set up in the name of plaintiff with Miller Finance with these expenses. Alta Verde allegedly sold plaintiff "Holstein Steers", and yet on June 2, 1986 defendant charged plaintiff for castration of 90 head of cattle. Plaintiff's cattle were sold from time to time between May and August of 1986, and plaintiff was charged only for the amount of cattle remaining on the feed lot at any particular time. The expenses, including interest through March 1987 amounted to a total of $52,748.95.

Plaintiff contends that beginning in February 1986, he attempted to find out when the cattle would be sold, but was unable to obtain an answer. Defendants contend that after the expiration of the supposed March 1 deadline for sale, Alta Verde employee William Mies contacted plaintiff who authorized the continued feeding of his cattle. Plaintiff admits that in reliance on the expertise of Mr. Mies he did acquiesce in the continued feeding of the cattle for a short time.

Plaintiff contends that defendants made no effort to obtain "authority to sell" until after May 2, 1986, at which time the cattle weighed in excess of 1400 pounds each, and were no longer marketable. Defendants contend that they attempted on several occasions prior to May 2, 1986 to contact plaintiff in order to obtain authority to sell his cattle. Plaintiff's cattle then took a longer than normal time to sell because they were at heavier than the then-current desired market weight. Eighty of plaintiff's cattle were sold on May 27, 1986 at $53.90 per hundredweight, forty cattle in mid-June at $50.25 per hundredweight, and sixty-four on July 10 at $52.50 per hundredweight. During this period, defendants continued to feed the cattle and charge plaintiff for the expense. The parties dispute whether defendants ever received plaintiff's authority to sell the cattle, although defendants provide no evidence of such authority.

Defendants admit the between March and September 1986, the same period that plaintiff's cattle were supposedly unmarketable, KLM Industries, Inc. and Miller Feeders, Inc. sold in excess of 2,000 head of cattle through the facilities of Alta Verde. Although the Alta Verde Beef Pack was in operation at all times from May 2, 1986 through August 1986, it did not purchase any of plaintiff's cattle.

On or about June 10, 1986 Miller Finance Company notified plaintiff of the total amount of his indebtedness including financing costs offset by the sale of plaintiff's cattle. The difference, which equals the debt liability defendants contend is still owing is $21,978.45. Plaintiff's cash down-payment and the allegedly outstanding indebtedness totals $49,541.27.

## DISCUSSION

Rule 56(c), Fed.R.Civ.P. sets forth the applicable standard for a motion for summary judgment. Under Rule 56(c), the moving party must "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(e) provides that "an adverse party may not rest upon the mere allegations or denial of its pleadings, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." As the Supreme Court stated in *Celotex Corp. v. Catrett*, 477 U.S. 317, 325–26, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265, 275 (1986), Rule 56(e) "... requires the non-moving party to go beyond the pleadings and by her own affidavits or by the 'depositions, answer to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" The nonmovant must produce sufficient evidence on each of the crucial elements of his claim or suffer summary judgment. In short, when a defendant moves for summary judgment he asks plaintiff "Where's the beef?"

Defendants have moved for summary judgment on each of the eleven counts in the Amended Complaint and on their counterclaim. The court will address defendants' arguments *seriatum.*

## A. COUNT ONE: THE SECURITIES ACT OF 1933, 15 U.S.C. § 77e

### 1. Is the Agreement a "Security"?

■ Defendants first argue that they are entitled to summary judgment on all securities related counts because the transaction at issue is not a "security", and thus is not subject to state or federal securities regulation. In *S.E.C. v. W.J. Howey Company*, 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1102–1103, 90 L.Ed. 1244 (1946), the Supreme Court defined an "investment contract" as "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or third party." Courts have distilled this language into a three-element test known as the *Howey* test: (1) an investment of money, (2) in a common enterprise, and (3) an expectation of profit solely from the efforts of others. Subsequent decisions interpreting *Howey* have generally rejected a literal interpretation of the word "solely" in favor of a more realistic definition. *See S.E.C. v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476, 482 (9th Cir.), *cert. denied*, 414 U.S. 821, 94 S.Ct.

117, 38 L.Ed.2d 53 (1973). Thus, the test has become "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Id., accord Williamson v. Tucker,* 645 F.2d 404 (5th Cir.), *cert denied,* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981); *Waterman v. Alta Verde Industries, Inc.,* 643 F.Supp. 797, 800 (E.D.N.C.1986), *aff'd* 833 F.2d 1006 (4th Cir.1987); *cf. United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 852 n. 16, 95 S.Ct. 2051, 2060 n. 16, 44 L.Ed.2d 621 (1975) (declining to reach the issue).

The only portion of the *Howey* test in dispute in this case is the third element. However, both the understanding of all the parties as to the agreement and the undisputed economic realities of the situation indicate that Alta Verde was expected to have primary control over the purchase, feeding, care and sale of the investor's cattle. Alta Verde does not dispute that it agrees to purchase cattle for the investor, feed the cattle and care for their veterinary needs, and sell the cattle at the end of the feeding cycle. The parties do not dispute that investors may have a more active role if they so choose, but there is nothing in the record to indicate that plaintiff ever intended to become involved in the maintenance and care of his cattle or that defendants had the least expectation that he would do so. *See Waterman,* 643 F.Supp. 797, 802–807 (finding a written contract between an investor and the same Alta Verde defendant to be a "security"); *see also Plunkett v. Francisco,* 430 F.Supp. 235 (N.D.Ga.1977) (finding investment in a calf management program to be a security).

The court concludes that the Alta Verde program and the agreement between the parties meets the *Howey* test because the efforts contemplated and performed by Alta Verde are the "undeniably significant ones ... which affect the failure or success of the enterprise."

2. Is the Count One Barred by the Statute of Limitations?

■ In Count One of the Amended Complaint, plaintiff alleges that Alta Verde in its dealings with plaintiff violated Section 5 of the Securities Act of 1933, 15 U.S.C. § 77e (1981), which prohibits the use of interstate commerce to sell unregistered securities. The civil remedy for a violation of § 77e is found at 15 U.S.C. § 77*l* (1), which allows an injured party to rescind or sue for damages. This civil remedy is subject to the following statute of limitations:

No action shall be maintained to enforce any liability ... if the action is to enforce a liability created under 77*l* (1) of this title, unless brought within one year after the violation upon which it is based. In no event shall any such action be brought to enforce a liability created under section 77k or 77*l* (1) of this title more than three years after the security was bona fide offered to the public.

15 U.S.C. § 77m (1981). The statute "begins running on the date of the act prohibited by section 5(a) [15 U.S.C. § 77e]." *Raiford v. Buslease, Inc.,* 825 F.2d 351, 353 (11th Cir.1987). As this court has noted, "[t]he relevant inquiry regarding the running of the statute of limitations ... is 'which of the Defendant's activities—offer, sale or delivery—occurred last' because this last event is the time from which to measure the limitation period." *Hamilton Bank and Trust Company v. Holliday,* 469 F.Supp. 1229, 1237 (N.D.Ga.1979) (Moye, J.). This court also noted that the limitations period "runs from the time of the last alleged violation or pertinent activity." *Id.*

Plaintiff contends that although he purchased both the cattle and feed on December 31, 1985 by sending payment by wire transfer in the amount of $27,500.00, the remaining indebtedness was carried on account by Alta Verde through its subsidiary Miller Finance and thus that the transaction was not complete until all of the additional feed had been charged to the account and the cattle sold and credited to the account. This date, August 24, 1986, plaintiff contends is the date from which the

limitations period should begin to run. The only alleged violation of the 1933 Act is the use of interstate commerce in the sale of unregistered securities. Both parties agree that the contract for sale took place when the oral agreements and money transmittal took place on December 31, 1985. In an analogous case, the one year period governing an action to recover for an alleged 1933 Act violation was considered to have run from the date of the sale and not from the date the last payment was made on an installment note given as part of the purchase price. *Holloway v. Combined Equities, Inc.*, 628 F.Supp. 59 (M.D.La.1986).

The court finds the date of sale was the last pertinent activity to the alleged violation. Alta Verde's subsequent sale of the cattle purchased by plaintiff does not constitute an "activity" prohibited by § 77e. The investment by plaintiff in the cattle feed program constituted the security. Because plaintiff did not file suit until February 18, 1987 the action brought under §§ 77e and 77*l* is barred by the one-year statute of limitations of § 77m. Summary judgment on Count One is appropriate.

## B. COUNT TWO: FRAUD UNDER § 10b–5

Plaintiff in his Amended Complaint raises three general assertions of fraud as the alleged violations of 15 U.S.C. 78j, 17 C.F.R. § 240.10b–5: (1) defendants failed to disclose to plaintiff that these were unregistered securities; (2) nor did they disclose material adverse information about the risks inherent in investing in commodities and the losses that could be suffered by plaintiff as a result of adverse commodity price fluctuations; (3) nor did they disclose conflicts of interest of defendants that could adversely affect plaintiff as an investor in the cattle feed operation. Defendants have moved for summary judgment on allegations (2) and (3); defendants do not

mention allegation (1) in the brief in support of their motion. Defendants also contend that defendant Miller Finance is entitled to summary judgment because it was not involved in the solicitation, offer to sell, or sale of the securities at issue.

In response, plaintiff argues that the list of allegations of common law fraud found in Count VI also constitute the elements of securities fraud in Count II. Defendant objects to this recharacterization, but the court feels that consistent with the somewhat conflicting mandates of Rules 8(a) and 9(b), it should read the Amended Complaint as a whole. Read in this way, the Amended Complaint sets forth a short plain statement of the claim which states the alleged fraud with particularity. *See Currie v. Cayman Resources Corp.*, 595 F.Supp. 1364, 1371 (N.D.Ga.1984) (Moye, J.); *Friedlander v. Nims*, 755 F.2d 810, 813 n. 3 (11th Cir.1985). The court does feel that plaintiff's allegations of fraud should be limited to the three general categories of fraud actually mentioned in Count II. Read generously, several of specific allegations of Count VI fall within the three general categories of Count II. Defendants had sufficient notice of these claims against them and have suffered no prejudice by the inclusion of these allegations in Count II, as defendants have responded to each allegation.

Paragraph 91(n) of the Amended Complaint alleges that defendants did not disclose the significant market risks involved with this investment. The court believes this fits within the purview of allegation (2) of Count II, that defendants did not disclose the risks inherent in investing in commodities. Likewise, the court believes that paragraph 91 subparagraphs (c), (e), (f), (j) and (*l*) fit within the purview of plaintiff's allegation in Count II that defendants did not disclose conflicts of interest that could adversely affect plaintiff as an investor in the program.[1]

---

1. These particular allegations found in paragraph 91 include (c) Defendants did not disclose the ownership, feeding and sale of cattle owned by Miller Feeders, Inc., and KLM Industries, Inc., both of which were controlled by Defendant Leon Miller and competed with the sales of

plaintiff's cattle; (e) Defendants did not disclose that Defendant Alta Verde Industries, Inc., contrary to published information it provided to plaintiff, made substantial profits on medical and miscellaneous services; (f) Defendants did not disclose that Defendant Alta Verde Indus-

### 1. Failure to Disclose Unregistered Securities

 Plaintiff alleges that defendants failed to disclose that they sold plaintiff an unregistered security. As noted above, the defendants have not moved for summary judgment on this allegation, or at least have not addressed it in their brief in support. Although the court has ruled that the statute of limitations bars plaintiff's 1933 Act § 77e claim that defendants used interstate commerce in the sale of an unregistered security, that statute of limitations is inapplicable here in the § 10b–5 context. Additionally, plaintiff's claim regards failure to disclose that the security should have been but was unregistered; and therefore, the claim rests on a different basis. Where the ingredient of fraud is added to conduct actionable under the 1933 Act, section 77a *et seq.*, relating to civil liabilities, such conduct becomes actionable under the provisions of Rule 10b–5 whether or not the plaintiff could maintain a suit under the 1933 Act. *Fischman v. Raytheon Mfg. Co.*, 188 F.2d 783 (2d Cir.1951); *see also Berger v. Bishop Inv. Corp.*, 695 F.2d 302 (8th Cir, 1982).

 The court has already found that the transaction at issue was a "security" for purposes of regulation under the 1933 and 1934 Acts. The defendants admit that they never registered the offered transaction with the Securities and Exchange Commission. Further, there is no dispute that defendants did not disclose that these were unregistered securities when the sale was made to plaintiff.

The essential elements of a § 10b–5 action are: (1) false representation of a material fact or omission of a material fact; (2) made with scienter; (3) upon which the plaintiff justifiably relied; (4) that proximately caused the plaintiff's damages. *Diamond v. Lamotte*, 709 F.2d 1419 (11th Cir.1983). As reliance is presumed in an omissions case, the only elements remaining for plaintiff to prove are scienter and proximate cause; however, as indicated in its previous order denying plaintiff's motion for summary judgment, the court believes these issues must remain for the trier of fact.

### 2. Disclosure of Risks in the Venture

 Defendants contend that plaintiff's claim that they failed to adequately inform him of the risks of fluctuations in the market for commodities generally and for cattle specifically, has no support in the record. Indeed, defendants show evidence that plaintiff was made aware by Mr. Hall before his meetings and discussions with Alta Verde that market conditions would determine the price of his cattle. Seale Dep. at 73. Defendants also point out that plaintiff admits they never guaranteed him a profit. *Id.* at 108. Defendants also show evidence that Mr. Hall told plaintiff that another investor had a small loss the previous year in investing in an Alta Verde feeding agreement and argue from this that plaintiff knew there was a possibility of a loss in this operation. Hall Dep. 61–62. Hall also testified that Alta Verde told plaintiff at meetings attended by both plaintiff and Hall that people had lost money previously and that Alta Verde could not guarantee a price for the cattle. *Id.* at 35–39.

Plaintiff however testified that Chip Miller represented to him that while the market could go down, it could only go down within a certain limit. That limit plaintiff testified was that the market "can fluctuate within a matter—not to exceed five cents." Seale Dep. at 96–99. Plaintiff acknowledged that he understood that if the cattle became overweight, they would "lose marketability and value." *Id.* Thus, resolving all reasonable doubts in favor of the nonmovant as this court must on a motion for summary judgment, plaintiff has provided sworn testimony that defendants misrepresented the true nature of the cattle market and told him that the price of cattle could fall only a few cents. A genu-

---

tries, Inc. used a higher markup on feed prices than the prevailing market; (j) Defendants misrepresented that Alta Verde Beef Pack would provide a competitive market for plaintiff's cat-

tle; and (*l*) Defendants misrepresented that all the cattle being offered to plaintiff were neutered and were steers at the time of offer and sale, when in fact these cattle were heifers.

ine issue remains as to the reasonableness of plaintiff's reliance on this statement.

### 3. Conflicts of Interest

The court has already noted plaintiff's specific allegations of undisclosed conflicts of interest. *See* note 1 *supra.* The court will now address each allegation.

#### (a) Cattle Sales by KLM Industries

■ Plaintiff contends that defendants did not disclose that KLM Industries and Miller Feeders, companies in which defendants had a financial stake, would own, feed and sell cattle during the pendency of plaintiff's investment. Plaintiff asserts and defendants admit that KLM Industries and Miller Feeders sold in excess of 2,000 head of cattle through the Alta Verde facilities between March and September 1986, the very time plaintiff contends defendants said they could not sell plaintiff's cattle. Plaintiff contends this was a material omission that proximately caused him damage in lost sales of his cattle because defendants sold their own cattle rather than plaintiff's cattle during this time. As a result plaintiff's cattle became overweight and unmarketable because of continued feeding, and defendants improperly earned extra money on feed sales because of the unnecessary delay.

Assuming the failure of defendants to inform plaintiff of this potential conflict of interest was a material omission, the court feels nevertheless that summary judgment is warranted on plaintiff's allegation. The court finds that plaintiff has failed to create a genuine issue of material fact in attempting to demonstrate that this misrepresentation was a proximate cause of plaintiff's damages. In *Currie v. Cayman Resources Corp.,* 835 F.2d 780 (11th Cir. 1988), the court recently recognized the concept of "loss causation" as a prerequisite for demonstrating the existence of proximate cause in a § 10b–5 case. Loss causation, according to the Circuit, requires a showing that "the misrepresentations or omissions caused the economic harm. In other words, a plaintiff must demonstrate that defendants' fraudulent conduct 'touches upon the reasons for the invest-

ment's decline in value.'" *Id.* at 785; *see Huddleston v. Herman & MacLean,* 640 F.2d 534, 549 (5th Cir.1981). Therefore, plaintiff must prove some type of causal relationship between the omission and the alleged pecuniary loss.

Here, plaintiff has provided no evidence that his cattle were in fact ready to market during the time period at issue. Plaintiff has not shown that his cattle were in any way comparable to that of KLM Industries or Miller Feeders' cattle. Plaintiff has provided the court with no evidence that KLM Industries or Miller Feeders sold their cattle in preference to plaintiff's. Plaintiff has shown the court no evidence that KLM Industries and Miller Feeders' sales could affect the market price for cattle. Indeed, in the absence of these facts, plaintiff has failed to demonstrate how any loss to plaintiff was due to KLM Industries and Miller Feeders selling their cattle.

#### (b) Veterinary Services and Miscellaneous Profits

■ Plaintiff contends that Alta Verde Industries contrary to published material it provided plaintiff, made substantial profits on medical and miscellaneous services provided for plaintiff's cattle. Defendants do not dispute that they never represented to plaintiff that they would gain profit on veterinary and related services. In support of his allegation, plaintiff has been able to produce only one citation to the evidentiary record of the "total gross margin" received by Alta Verde for "hospital or vet sales" as well as the drugs dispensed for the entire north and south feedlots. Chip Miller Dep. at 175–176. The figures there show that the cost of the drug was $533,220 and that gross sales was $910,361, leaving a profit margin of $377,141. Defendant Miller testifies that these figures exclude some expenses that would have to be deducted from the gross profit to accurately reflect any net profit, including labor and the cost of consulting a nutritionist. Miller did not know the exact amount of such expenses incurred.

Plaintiff, however, has not demonstrated to the court any such charges to his pen of cattle, nor whether any profit was made on

veterinary services to his cattle. Further, plaintiff has not indicated what other costs were involved in defendants' provision of veterinary services, such as labor or consulting fees, so as to prove that defendants actually realized a net profit on plaintiff's pen of cattle or on the veterinary program as a whole.[2] Plaintiff has again failed to demonstrate a sufficient causal relationship between defendants' omission and plaintiff's loss.

### (c) Profits from Markup on Feed Prices

■ Plaintiff contends that Alta Verde failed to represent that it used a higher markup on feed prices than the prevailing market price. In support, plaintiff cites the deposition of Leon Miller for the proposition that Alta Verde marked up their feed prices more than the industry average. However, defendants correctly point out that Miller's testimony flatly refutes this contention first in stating that Alta Verde adopts the industry average of 30 dollars per ton over cost of the feed, and in saying that Alta Verde has to stay competitive with other feed yards. Leon Miller Dep. at 162–63. Further, plaintiff's citations to the record indicate that Miller unequivocally resisted opposing counsel's efforts to gain his admission that the markup was higher than market rate. Leon Miller Dep. at 203–210.[3]

Moreover, plaintiff has introduced no evidence of the prevailing market price for feed to which defendants' alleged price may be compared. Absent such evidence plaintiff cannot establish that defendants charged a feed price higher that the prevailing market. Plaintiff cannot show that defendants omitted to disclose a material fact, nor can they demonstrate that plaintiff was damaged by overcharging of feed prices. Thus, plaintiff's claim as to this allegation cannot survive defendants' summary judgment motion.

---

**2.** Plaintiff's contention that cowboys tending the herd are paid $250 per week is not supported by plaintiff's citation to the record. Mies Dep. at 56, line 14; 57, line 19.

**3.** Indeed, plaintiff in his response brief states in reference to this testimony only that "[h]owever

### (d) Purchases by Alta Verde Beef Pack

■ Plaintiff contends that defendants misrepresented that Alta Verde Beef Pack would provide a competitive market for plaintiff's cattle. Plaintiff asserts that in soliciting the investment, purchases by Alta Verde Beef Pack were portrayed by Alta Verde to potential investors in the cattle feeding program as a benefit of the program. Leon Miller Dep., Ex. 1 at 4, 16. The Alta Verde promotional brochure produced by plaintiff states in the paragraph after it mentions the packing facility, that "[Alta Verde Industries] has established a stable market for fat cattle by providing for every facet of operation that needs to be involved in a custom cattle feeding business." *Id.* Plaintiff contends that although Alta Verde Beef Pack was operating at all times from May 2, 1986 through August 1986, it did not purchase any of plaintiff's cattle. Defendants do not dispute these facts, they merely respond that Alta Verde Beef Pack did not represent that they were required to overbid the market in order to purchase plaintiff's cattle. Alta Verde's brochure stated only that Alta Verde "guarantees ranchers and other customers a competitive price when the time is right to sell their fat cattle." Leon Miller Dep., Ex. 1. In fact, the brochure states, "[i]f there is a better price to be found elsewhere in the marketplace, Alta Verde will advise them of it and if they choose, will ship the cattle there." Miller Dep., Ex. 1 at 16.

Plaintiff also asserts that the prices paid by Alta Verde Beef Pack were higher during the period May 16 through August 15, 1986 than that received by plaintiff during the same period, but plaintiff's citation to the record does not support that proposition. Mies Dep., Ex. 1; and at 38, lines 10–16.

Plaintiff has provided no evidence that, at the relevant time, the Beef Pack price

---

I have trouble believing him [Leon Miller] as he has been caught in a lie dealing with KLM owned cattle which was in direct competition to unrelated parties (sic)." Plaintiff's Response at 84.

was higher than the price for which plaintiff's cattle were actually sold. Plaintiff has provided no evidence that defendants misled him in regards to the responsibility of Alta Verde Beef Pack to purchase plaintiff's cattle, nor that the failure of Beef Pack to purchase plaintiff's cattle damaged him in any way. Summary judgment is proper then on plaintiff's claims based on this allegation.

■ As an additional matter, defendant argues that Miller Finance Company is entitled to summary judgment on plaintiff's securities related claims because it is undisputed that Miller Finance never offered to sell, never sold any security or other interest to plaintiff. Plaintiff however has established by the factual record that Miller Finance had only one group of clients in that it financed purchases by investors in the Alta Verde cattle feeding program and was a wholly owned subsidiary of Alta Verde. Plaintiff has also created at least a factual issue as to whether the sale of cattle and feed was accomplished through the participation of Miller Finance. Without that participation, plaintiff argues the sale under the normal Alta Verde procedure of cash plus financing, could not have occurred. Thus, an issue remains for the trier of fact as to whether Miller Finance aided and abetted the other defendants in violation of § 10b–5.[4]

## C. COUNT THREE: GEORGIA SECURITIES LAW CLAIMS

■ Plaintiff contends that by failing to register the cattle purchase transaction as a security, defendants have violated the Georgia Securities Act. Ga.Off'l Code Ann. § 10–5–1, *et seq.* Plaintiff's claim relates to the alleged offer and sale of unregistered securities. Plaintiff in his response brief contends that this claim also relates to alleged fraudulent misrepresentations and omissions in violation of the Georgia securities laws, but Count Three of the Amended Complaint alleges only violations of Ga.Off'l Code Ann. § 10–5–3 and 10–5–5 relating to the defendants' alleged

failure to register the securities. The Amended Complaint does not articulate a theory of recovery under the Georgia securities laws based on securities fraud. Defendants contend that summary judgment is proper on this claim because: (1) the sale did not take place in Georgia and thus the Georgia Securities Act does not apply; and (2) Miller Finance did not participate in any sale or offer to sell the investment.

Defendants cite two cases in support of defendants' contention that the sale did not take place in Georgia, and therefore was not subject to the Georgia securities laws. *See Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.,* 608 F.2d 175 (5th Cir.1979); *Fine v. Bradford,* 109 Ga. App. 380, 136 S.E.2d 147 (1964). Both cases; however, involve suits by purchasers against their brokers. In both cases, unlike the instant action, the broker-defendants were acting as agents of the purchaser and completed the transaction in states other than Georgia on behalf of their clients. Here, the plaintiff-purchaser negotiated and finalized the contract during the December 31, 1985 telephone call with Leon Miller while plaintiff was in Atlanta. During the conversation, Miller solicited a cash downpayment from plaintiff as part of the contract. Plaintiff caused the cash downpayment on the investment to be transferred to defendants from plaintiff's Georgia bank account. Moreover, defendants had sent plaintiff letters, brochures and other materials and had advertised in national publications knowing they would be distributed in Georgia.

The court finds that under the applicable principles of Georgia law, these contacts are sufficient to establish a sale within the state of Georgia. *See Allen v. Smith & Medford, Inc.,* 129 Ga.App. 538, 540–42, 199 S.E.2d 876 (1973). As noted above in the discussion of plaintiff's federal securities law fraud claims, a genuine issue of material fact remains as to whether Miller Finance aided and abetted the sale of the investment to plaintiff. The court finds

---

**4.** The Amended Complaint gives defendant Miller Finance adequate notice that the claims against it are based on a theory of aider and abettor liability.

that summary judgment is inappropriate on plaintiff's Georgia securities law claim.

## D. COUNT FOUR: FEDERAL RICO ACT CLAIMS

 Defendant attacks plaintiff's federal RICO claims on two grounds: (1) the defendants have committed no "predicate act" under the meaning of the statute; and (2) any supposed predicate acts are not alleged with sufficient particularity to state a claim under the requirements of the statute and Rule 9(b), Fed.R.Civ.P. The court feels however that since a genuine issue remains as to plaintiff's federal securities law or state law fraud claims, and because plaintiff has produced evidence that in committing this alleged fraud defendants utilized the mail and wires, plaintiff has demonstrated sufficient predicate acts to maintain his federal RICO claim. As to defendants' contention that the predicate acts are plead with insufficient particularity, the court is mindful that it must read Rule 9(b) in conjunction with Rule 8 and not adopt "too narrow an approach and fail to take into account ... the general simplicity and flexibility contemplated by the rules." Wright & Miller, Federal Practice and Procedure, § 1298 at 407. Plaintiff has properly and quite explicitly pleaded the elements of a federal RICO claim and has answered defendants' challenge on summary judgment to produce sufficient evidence in support of these allegations.[5] The court finds that summary judgment is inappropriate on this claim.

## E. COUNT FIVE: GEORGIA RICO ACT CLAIMS

 Plaintiff contends that defendants have also violated the Georgia RICO Act, Ga.Off'l Code Ann. § 16–14–1 *et seq.* Defendants move for summary judgment based on the same reasons they argue summary judgment was appropriate on plaintiff's federal RICO claims. For the reasons given above with respect to plaintiff's federal RICO claim, the court finds that summary judgment on plaintiff's Georgia RICO claim is inappropriate.[6]

## F. COUNT SIX: GEORGIA FRAUD AND MISREPRESENTATION CLAIMS

 Georgia Code § 51–6–2 provides:

Willful misrepresentation of a material fact, made to induce another to act, upon which such person acts to his injury, will give him a right of action. Mere concealment of a material fact, unless done in such a manner as to deceive and mislead, will not support an action.

Ga.Off'l Code Ann. § 51–6–2 (1982). *See also Jackson v. Smith,* 94 Ga.App. 697, 701, 96 S.E.2d 193 (1956); *Friedman v. Goodman,* 222 Ga. 613, 623, 151 S.E.2d 455, 462 (1966). The elements of fraud in Georgia are that: (1) the defendant made representations or omissions; (2) that at the time he knew such misrepresentations were false; (3) the defendant made the representation or failed to disclose a fact with the intention and purpose of deceiving the plaintiff; (4) that the plaintiff reasonably relied on such misrepresentations; and (5) that plaintiff sustained the alleged damage as a proximate cause of defendants misrepresentation or omission. *Davi v. Shubert,* 168 Ga.App. 420, 309 S.E.2d 415 (1983).[7]

---

**5.** For the same reasons mentioned earlier in discussing plaintiff's securities claims, a genuine issue remains for the trier of fact as to whether Miller Finance acted as an aider and abettor in the alleged RICO violations as well.

**6.** Defendants also raise a third reason for granting summary judgment in their favor on this count. Defendants argue that this claim should fail because plaintiff has failed to allege or provide evidence that defendants actions were related to any organized criminal element or any interrelated pattern of criminal activity. This court; however, has held that failure to allege or prove such an association with organized crime is not fatal to a Georgia RICO claim. *Stanton v. Shearson, Lehman/American Express, Inc.,* 622 F.Supp. 293, 294 (N.D.Ga.1985) (Hall, J.); *but see Georgia Gulf Corp. v. Wilbur J. Ward,* —— F.Supp. ——, No. 1:87–CV–1404–WCO (N.D.Ga. December 31, 1987) (O'Kelley, J.).

**7.** The defendants argue the applicability of *Charter Medical Management Co. v. Ware Manor, Inc.,* 159 Ga.App. 378, 283 S.E.2d 330 (1981) and *General Motors Acceptance Corp. v. Bowen Motors, Inc.,* 167 Ga.App. 463, 306 S.E.2d 675 (1983) for the proposition that defendants had

Defendants challenge plaintiff to produce sufficient evidence to support his numerous contentions regarding defendants' fraud. As many of plaintiff's allegations have previously been dealt with by the court in the section of this order pertaining to plaintiff's § 10b–5 claims, the court will not repeat its treatment of them here.[8] The court turns to each of plaintiff's allegations to ascertain whether plaintiff has offered sufficient factual support for them to avoid summary judgment.

#### 1. March 1, 1986 Sales Date

▇▇▇ Plaintiff contends that Chip Miller told him that the cattle in the pens pre-selected for them would be sold no later than March 1, 1986. Defendants attack this allegation contending that plaintiff has shown no evidence that defendants ever made a projection as to a particular sales date, that plaintiff expressly and impliedly authorized the continued feeding of his cattle beyond the March 1, 1986 deadline, and that plaintiff has offered no evidence that the cattle were ready for market on March 1, 1986.

Plaintiff in his affidavit does state that he relied on assurances of Chip Miller that the cattle would be sold no later than March 1, 1986. Seale Affidavit ¶ 7. However, plaintiff at his deposition admits that he authorized, or at least acquiesced in, allowing defendants to continue feeding his cattle. Seale Dep. at 129–130. Plaintiff contends that he relied on Bill Mies, Alta Verde's Feedlot Manager, when Mies allegedly said the cattle had not gained the appropriate amount of weight and were not ready to market as of March 1. *Id.* at 129–131. Plaintiff has not alleged as a part of this particular claim that Mr. Mies'

representations were false. More importantly, plaintiff has provided the court with no evidence that the cattle were ready for market on March 1. Given the unconflicting evidence that plaintiff acquiesced in the continued feeding of the cattle after that date and the lack of any evidence that the cattle was ready for sale, plaintiff cannot establish any entitlement to damages; and therefore, cannot survive defendants' motion on this allegation.

#### 2. Projected Sales Price

▇▇▇ Plaintiff contends that defendants made no reference to any variance in the profit expectations from those in their Estimated Feeding Projection. Plaintiff asserts that the purchase price paid by plaintiff could not have yielded a profit based on those projections. Defendants counter that they provided the projection as an example of a pen of cattle in order for plaintiff to familiarize himself with the considerations and variables that would govern any profit or loss on the sale of his cattle. Defendants point out that the projection on its face differs from the invoice for plaintiff's cattle and that plaintiff's alleged reliance on this document was unreasonable. The projection concerned a pen containing 175 head of cattle, while plaintiff's invoice states the plaintiff's herd contained 185 head. The average "in-weight" of the cattle in the projection was 300 pounds, while plaintiff's herd averaged 294 pounds. The projection indicates a purchase price of $80.00 per hundred weight, while the plaintiff's invoice indicates a purchase price of $88.02 per hundred weight. Plaintiff contends a jury question exists as to whether his reliance on these figures was reasonable. Defendants also point out that the

no duty to disclose anything to plaintiff. The court feels that given the facts of this case involving the sale of an investment, those cases are distinguishable on their facts and are therefore inapposite. Defendants also contend that plaintiff has not produced evidence of reliance by plaintiff on defendants' misrepresentations, however the parties cite conflicting evidence in this regard. The court finds that where a genuine issue exists as to plaintiff's allegations of defendants' fraud, a jury question also exists on the issue of reliance.

**8.** Suffice it to say that as to those issues already dealt with by the court in its discussion of plaintiff's § 10b–5 claim, ¶ 91(n) pertaining to failure to adequately disclose the risks associated with the investment remains. The court has ruled that paragraph 91 subparagraphs (c), (e), (f), and (j) are not supported by sufficient evidence. For the reasons mentioned in that portion of the order, those allegations cannot survive summary judgment as to plaintiff's Georgia fraud claims as well.

Estimated Feeding Projection contains the following language set off in a box outlined by asterisks at the bottom of the projection: "This information is based on current market estimates and should not be considered as a guarantee of future prices, performances or results."

 The court believes this allegation cannot survive defendants' motion. First, speculation and projections of future events cannot form the basis for fraud in Georgia. *Dye v. Dye,* 231 Ga. 533, 202 S.E.2d 418 (1973); *Vaughan v. Oxenberg,* 105 Ga.App. 295, 124 S.E.2d 436 (1962); *Beach v. Fleming,* 214 Ga. 303, 104 S.E.2d 427 (1958). Second, the projection states by its express language that it should not be relied upon as a guarantee of future profits. Plaintiff has failed to allege or show that defendants in any way prevented him from reading this disclaimer or attempted to induce him to ignore its meaning. *Musgrove v. Musgrove,* 213 Ga. 610, 100 S.E.2d 577 (1957). Third, plaintiff has offered no evidence that the projection was not accurate when made. Plaintiff was unreasonable as a matter of law to have relied on this projection as predictive of his actual profit. Contrary to plaintiff's allegations, defendants had no duty to disclaim the applicability of the projection further than the disclaimer that appears on the face of the document.

### 3. Failure to Weigh Cattle on Date of Sale

 Plaintiff contends that defendants did not disclose that plaintiff's cattle were

not weighed on the date of sale nor that such weight could not be accurately determined. Defendants respond that there was no need to weigh the cattle on the date of sale. The cattle were weighed, according to defendants, when they were purchased by Alta Verde, and the price which plaintiff was charged was based on that weight plus the cost of feeding and maintenance up to the time of sale to the plaintiff. Leon Miller Dep. at 71, 147.

Plaintiff argues that because the cattle were not weighed on the date of sale, plaintiff is unable to determine the accuracy of defendants' contentions that in March 1986 the cattle had not gained sufficient weight and were not yet ready to market. Plaintiff insists that the cattle might have failed to gain the appropriate amount of weight through the feeding process prior to the time of plaintiff's purchase. Plaintiff; however, has been unable to explain or demonstrate how this alleged omission affected plaintiff's actions or how it caused him damage. Plaintiff, by his own admission, was periodically kept informed of the weight of his cattle. Plaintiff undisputedly could have requested this information at any time.[9] The court finds that summary judgment is proper on this allegation.

### 4. Comparability with Cattle Futures Listings

 Plaintiff alleges that defendant did not disclose that the prices of plaintiff's cattle could not be directly compared with live cattle prices as publicly traded and reported. Plaintiff in his response restates

**9.** The court is somewhat at a loss to understand the basis of plaintiff's fraud claim on this point. In his response brief, plaintiff appears to argue that the failure to weigh his cattle on the date Alta Verde sold them to plaintiff casts a shadow on whether the cattle failed to gain the desired weight during the time the cattle were owned by Alta Verde or during the time they were owned by plaintiff. Plaintiff's theory of fraud seems to be the unarticulated allegation that defendants purchased cattle, fed them, and charged plaintiff for a great deal of feed which would not have been necessary if the cattle had gained weight at the proper rate. During this time, the plaintiff seems to contend, defendants charged a large amount of feed toward the eventual price plaintiff paid (defendants' cost plus the feed and

maintenance expenses). Presumably then defendants passed along the costs to plaintiff in the purchase price, even though the cattle's weight at that time would not have justified that price. Plaintiff's theory; however, does not support an action for fraud in this case because there is no allegation that defendants concealed the method of determining the eventual purchase price from plaintiff. To the contrary, plaintiff admits that he understood that the price would be determined by the cost to defendants. Plaintiff thus knew of and took the risk that the cattle might be overpriced relative to their weight at the time he purchased them. By the same token, plaintiff could have benefitted from this bargain had the cattle gained weight more efficiently.

this allegation as "whether defendants' cattle prices compare to the price of a futures contract in live cattle as reported in a newspaper as the Atlanta Journal Constitution (sic)." Plaintiff contends that he "believed the defendants and defendants did nothing to discourage the belief that his live cattle were the equivalent of live cattle in the futures market." Plaintiff's Response at 85. Although the court finds it difficult to discern exactly what is being alleged as fraud here, the court does know that no record evidence supports what appears to be plaintiff's contention that defendants misrepresented that they were selling the equivalent of cattle futures. Nor has plaintiff presented evidence that defendants misrepresented that to plaintiff that he could compare the value of his cattle with the value of cattle generally in the commodities listings in such local newspapers as the *Atlanta Journal/Constitution.* The citations to the record by plaintiff do not support the proposition for which they are cited. Mies Dep. at 28.

### 5. Tax Deductions

 In paragraph 91 subparagraphs (h) and (i) of the Amended Complaint plaintiff alleges that defendants misrepresented that plaintiff could deduct expenses for feed and maintenance that defendant Alta Verde incurred prior to the sale of the cattle to plaintiff. Plaintiff also alleges that defendants misrepresented that plaintiff could deduct expenses for commodity feed purchases made December 31, 1985, without any business reason for such purchases. Defendants contend that they advised plaintiff to consult accountants and financial advisors relative to this transaction. Seale Dep.Ex. 19. Plaintiff has been unable to counter defendants' evidence.

More importantly, the rule in Georgia is well-settled that fraud cannot be predicated upon misrepresentations of law or misrepresentations as to matters of law. *Robbins v. National Bank of Georgia,* 241 Ga. 538, 246 S.E.2d 660 (1978); *Cotton States Mutual Ins. Co. v. Booth,* 116 Ga.App. 410, 157 S.E.2d 877 (1967). If plaintiff chose to make assumptions based upon statements by the defendants, knowing defendants were neither accountants or attorneys, then he failed as a matter of law to use sufficient diligence in relying on this information. Plaintiff has failed to address this argument in any way.

Moreover, plaintiff in his response brief admits that "the investor out of his own greed for a larger tax loss buys feed inventory on December 31." Plaintiff's Response at 87. Thus, plaintiff cites no support for the proposition in subparagraph (i) that defendants misrepresented that plaintiff could deduct his year-end feed purchases as a business necessity.

### 6. Showing of the Wrong Pen of Cattle

 Plaintiff contends that defendants misrepresented that the cattle shown to plaintiff on December 12, 1985 were the cattle being offered to plaintiff in the investment deal. Plaintiff correctly identifies the issue as whether Chip Miller showed plaintiff one pen of cattle and represented to him that this pen of cattle had been preselected for him, when in fact plaintiff was sold an entirely different pen of cattle. Plaintiff produces his sworn testimony that this indeed was the case. Seale Affidavit ¶ 6. Plaintiff asserts that he was shown the North Feedlot area at Alta Verde. Plaintiff testified that Miller represented to him that cattle on the North Feedlot had been preselected for him. The undisputed evidence shows that plaintiff was actually sold cattle from the South Feedlot which plaintiff had never seen.

Defendants argue that if plaintiff was accidentally shown the wrong pen of cattle, he may have a contract claim, but cannot advance a fraud claim because cattle are fungible commodities and which cattle plaintiff actually purchased made no difference to his loss. Defendant also contends that plaintiff has been unable to produce any evidence that the cattle on the South Feedlot were of an inferior quality to those he actually saw on the North Feedlot. However, the record evidence indicates that there was in fact a problem with the cattle actually sold to plaintiff in that they did not gain weight as quickly as desired or

expected. The court finds that an issue remains for the trier of fact as to the materiality of the alleged misrepresentation that plaintiff was shown one pen of cattle which he was led to believe he would be purchasing, and in fact was sold another.

### 7. Neutering of "Steers"

Plaintiff contends that defendants misrepresented that all the cattle being offered to plaintiff were neutered and were steers at the time of the offer and sale, when in fact these cattle were heifers. Given the further allegation that plaintiff was improperly charged for the castration of the supposedly already-castrated steers, the court assumes that the plaintiff is actually contending that he was mistakenly sold bulls or calves and not heifers. Plaintiff shows the court that defendant in its advertising "slick" represented that "within hours after the cattle have arrived they are weighed, given a proscribed program of innoculations, wormed and tempered [castrated]." Leon Miller Dep.Ex. 1 at 9.

Defendants have admitted that they mistakenly sold plaintiff 90 unneutered cattle, but contend that this mistake amounts only to a contract claim. Defendants cite no cases for the proposition that such a misrepresentation is only a contract claim and does not constitute a fraud claim as a matter of law. Additionally, plaintiff demonstrates that the over a great volume of cattle such an unwarranted charge can net substantial profits for defendants. The court believes a genuine issue remains as to the materiality of such a misrepresentation and whether such misrepresentation is *de minimus*.

### 8. Sale of One Dead Animal

Plaintiff contends that defendants did not disclose that on the day of purchase by plaintiff, defendants sold plaintiff one dead animal. Defendants assert that the death of one head of cattle is *de minimus* and cannot form the basis for a fraud claim. Defendants; however, cite no applicable cases for this proposition. Defendants contend that at best plaintiff has a contract claim for 1/185th of the contract price because one out of 185 cattle was dead on the date of sale. The court, in the absence of controlling authority to the contrary, finds that a genuine issue remains as to whether defendants' misrepresentation is *de minimus* or whether it is material and constitutes fraud.

## G. COUNT VII: AGENCY

Count Seven of the Amended Complaint alleges that the contract entered into by the plaintiff and Alta Verde created an agency relationship between the plaintiff, as principal, and the defendants, as agents. Plaintiff alleges that defendants breached their duty of diligence, loyalty and good faith as agents by not disclosing conflicts of interest of Leon Miller and Alta Verde in dealing in their own cattle to the detriment of plaintiff, and by failing to disclose omissions and misrepresentations of material facts. Defendants attack this allegation on four grounds: (a) no agency relationship existed, (b) the supposed agency was not violated by defendants' alleged cattle sales, (c) the omissions and misrepresentations referred to occurred before the creation of any supposed agency, and (d) plaintiff ratified the continued feeding of his cattle.

The court agrees with defendants' position that plaintiff has a cause of action only for those acts that occurred after the creation of the supposed agency relationship. Under Georgia law, agency does not arise until a person authorizes another person to act on his behalf, or subsequently ratifies the acts of another done on his behalf. *Aetna Insurance Company v. Glen Falls Insurance Co.*, 453 F.2d 687, 690 (5th Cir.1972). Plaintiff could not have authorized an agency relationship until he entered into the contract on December 31, 1985. Additionally, plaintiff has produced no evidence supportive of the proposition that by entering into the cattle feeding arrangement plaintiff somehow ratified the actions of the defendants in soliciting his investment. Therefore, plaintiff is entitled to claim only for breach

of this alleged relationship after December 31, 1985.[10]

█ Read generously, Count Seven does allege two breaches of the alleged agency relationship if the court assumes *arguendo* the existence of that relationship. Count Seven refers to the plaintiff's allegations in paragraph 91 of Count Six. The two allegations there that allege a breach of any agency relationship after the contract was entered are (1) that defendants continued to feed plaintiff's cattle past the point at which they were obligated to sell them; and (2) that defendants had a conflict of interest in the form of those cattle owned by KLM Industries and Miller Feeders. The court has; however, previously ruled in this Order that plaintiff acquiesced in the continued feeding of his cattle past the supposed March 1, 1986 deadline. *See* Order *supra* at B.3(a). Likewise, the court has ruled that the plaintiff has been unable to establish any causal link between the ownership and sale of cattle by KLM Industries or Miller Feeders and plaintiff's own damages. *See* Order *supra* B.3(c). For these reasons, plaintiff cannot survive defendants' motion for summary judgment on plaintiff's allegations of breach of the putative agency relationship. Summary judgment on Count Seven is appropriate.

## H. COUNT VIII: FRAUD AND DECEIT (Reprise)

Count VIII of the Amended Complaint states in full:

### COUNT VIII

#### 104.

Plaintiff incorporates by reference each of the allegations contained in Paragraphs 1 through 103 of this Complaint in this Count VIII, as Paragraph 104.

#### 105.

Defendant Miller Finance Company, Inc., and its employees Leon Miller, and Chip Miller have attempted to collect additional funds in the amount of TWENTY-ONE THOUSAND SEVEN HUNDRED NINETY-ONE AND 27/100 DOLLARS ($21,791.27) in furtherance of the solicitation and sale of securities to Plaintiff, and in an attempt by Defendants to prevent Plaintiff from demanding and obtaining the return of funds wrongfully and tortiously retained by Defendants.

#### 106.

Defendant Miller Finance Company, Inc. has no contract whatsoever with Plaintiff and by this action has participated with the other Defendants in furtherance of the Defendants illegal scheme to sell securities, and thus constitutes fraud and deceit, in violation of O.CC.G.A. Section 51-6-1; 51-6-2; and 23-2-52, for which Defendants are jointly and severally liable for actual and punitive damages, plus reasonable attorneys fees and costs.

Amended Complaint ¶ 104–106.

█ The court is unclear exactly what is being claimed by plaintiff. Defendants points out that paragraph 105 states that Miller Finance attempted to prevent plaintiff from demanding and obtaining a "return of funds." The act complained of apparently was Miller Finance's mailing to plaintiff a statement of his current account and his indebtedness to Miller Finance. Defendants correctly point out that this does not constitute fraud in any sense.[11]

---

**10.** Plaintiff makes the novel argument, not supported by any authority, that an agency relationship may be formed in Georgia retroactively to the first point that the putative agent had control of the eventual subject of the agency. In the absence of any case authority supporting this proposition, this court is bound by the controlling authority cited by defendants. *See Aetna Insurance supra.*

**11.** At best, plaintiff appears to allege that defendant Miller Finance mailed him a statement of his current indebtedness in order to intimidate him into not making a demand for the return of his original investment. Assuming the truth of this accusation (plaintiff has failed to offer any proof or inference from evidence of this intent), the act complained of amounts only to "hardball" by defendants, such could not affect plaintiff's rights to demand "return of funds." Plaintiff has altogether failed to show the court any evidence that this action by Miller Finance was part of any overall scheme to defraud plaintiff.

Likewise, defendants note that plaintiff has produced no evidence to support his allegations that this action was part of any overall scheme by defendant Miller Finance to defraud plaintiff. In fact, in his response brief, plaintiff abandons entirely this theory of fraud, raising instead for the first time allegations of fraudulent conduct by Miller Finance not raised in the Amended Complaint, evidently in order to demonstrate a continuing scheme of fraud. Included in this new list of alleged offenses is plaintiff's contention, mentioned nowhere before, that Miller Finance, contrary to Texas law, charged a "usurious interest rate" on its bank note purchased to cover plaintiff's account. Plaintiff has not properly moved the court to amend his complaint to state this new theory and the court is not inclined to overlook plaintiff's procedural violation given the obvious prejudice to the defendants of having to respond to new allegations at this stage in the case.[12] The court finds that summary judgement on Count Eight is appropriate.

## I. COUNTS IX., X. AND XI.: SALE OF BUSINESS OPPORTUNITIES

In Counts Nine, Ten and Eleven, plaintiff alleges that his purchase of cattle and feed from Defendants constituted the sale of a "business opportunity" as defined by Ga. Off'l Code § 10–1–410(2)(A). Georgia statutory law requires certain procedural fairness in the creation by a seller of a business opportunity for one entering a business. Plaintiff's basic contention is that defendants promoted the sale of their cattle feeding program as one which enabled plaintiff to become a *bona fide* cattle feeder in the business of feeding cattle for a profit. Plaintiff alleges that defendants did not comply with the statutory requirements for offering such an alleged "business opportunity". Specifically, plaintiff alleges violation by defendants of §§ 10–1–411, 414 and 415 which respectively require sellers of business opportunities as defined by the statute to make certain disclosures,

govern unsubstantiated predictions of profit, and govern sales of business opportunities made without a written contract.

Even if plaintiff was otherwise able to demonstrate a violation of the statue, summary judgment would nevertheless be appropriate because the statute specifically exempts any coverage of the type business at issue here. In the statutory section defining a "business opportunity", the Code provides for an exemption to its coverage from "[a]ny agribusiness corporation." Ga. Off'l Code Ann. § 10–1–410(2)(B)(iii). No Georgia cases have construed the meaning of this term, but this court, absent any contention that these words constitute a specialized term of art and consistent with the Code's rules of interpretation, gives its words their ordinary meaning. *Webster's Third New International Dictionary* defines "agriculture" as "the science or art of cultivating the soil, harvesting crops, and raising livestock; HUSBANDRY, FARMING (b): the science or art of the production of plants and animals useful to man and in varying degrees the preparation of these products for man's use and their disposal (as by marketing)." *Webster's* defines "agribusiness" as "a blend of agriculture and business." Agribusiness is further defined as "a combination of the producing operations of a farm, the manufacture and distribution of farm equipment and supplies, and the processing, storage, and distribution of farm commodities." *Webster's* defines "farm" as "a plot of land devoted to the raising of domestic or other animals." Plaintiff admits that Alta Verde is "in the business of selling agricultural products." Plaintiff's Statement of Material Facts filed in Support of Plaintiff's Motion for Partial Summary Judgment ¶ 22. Whether the statute exempts the seller or the buyer of an agribusiness opportunity, the court finds that both Alta Verde Industries and plaintiff as a self-acknowledged cattle feeder would constitute an "agribusiness" within the meaning of the statute. Therefore,

---

**12.** The court notes that even if it were to entertain such an allegation, plaintiff alleges only that the note indicates an interest rate on its face of 12%. The relevant Texas statute V.A.T.S.

5069–1.01–1.06, 1.04 allows a maximum contractual interest rate of 18%. Thus, plaintiff appears not to be able to sustain a claim on this allegation either.

the transaction at issue here was exempt from the Georgia "Sale of Business Opportunities" statute and plaintiff cannot maintain an action based on its provisions. Summary judgment is appropriate in favor of defendants on Counts Nine, Ten and Eleven.

## J. DEFENDANTS' COUNTERCLAIM

Defendants Alta Verde and Miller Finance counterclaim against plaintiff based on the deficiency remaining in plaintiff's account after the amount gained from liquidation of his herd was applied to the outstanding indebtedness on plaintiff's account. As genuine issues of fact remain as to the existence and amount of plaintiff's indebtedness to defendants, the issue of defendants' counterclaim cannot be resolved on motion for summary judgment.

CONCLUSION

For the reasons and specifically set forth herein, the court GRANTS IN PART and DENIES IN PART defendants' motion for summary judgment, or in the alternative for dismissal.

The following issues remain for trial:

*Count II:* (1) Whether defendants are liable under § 10b–5 for their failure to disclose that they sold plaintiff an unregistered security?

(2) Whether defendants are liable under § 10b–5 for defendants alleged representation that the market for plaintiff's cattle could fluctuate only a few cents?

*Count III:* Whether defendants are liable under the Georgia Securities laws for the sale to plaintiff of an unregistered security?

*Count IV:* Whether defendants are liable under the Federal RICO Act?

*Count V:* Whether defendants are liable under the Georgia RICO Act?

*Count VI:* (1) Whether defendants are liable under the Georgia Fraud statute for allegedly representing to plaintiff that he would be purchasing one pen of cattle, and allegedly selling him another?

(2) Whether defendants are liable under the Georgia Fraud statute for representing to plaintiff that he was purchasing steers when defendants allegedly sold him unneutered calves or bulls?

(3) Whether defendants are liable under the Georgia Fraud statute for selling plaintiff a herd of animals that included one dead animal?

So ORDERED.